# EXHIBIT 1

THE LAW OFFICE OF MATT VALENTI
Matt Valenti (State Bar No. 253978)
3747 Brookshire Street
San Diego, CA 92111
Telephone: (619) 540-2189
E-Mail: mattvalenti@outlook.com

Attorney for AntiCancer, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ANTICANCER, INC.,<br><br>        Plaintiff,<br><br>   vs.<br><br>PDOX, INC., dba CERTIS<br>ONCOLOGY SOLUTIONS, a<br>Delaware corporation; PETER<br>ELLMAN, an individual; and<br>DOES 1-10,<br><br>        Defendants. | Case No.: **'18CV1543 BEN MDD**<br><br>**COMPLAINT FOR:**<br><br>**1) FEDERAL TRADEMARK INFRINGEMENT**<br><br>**2) FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION**<br><br>**3) CONVERSION**<br><br>**4) FRAUD AND DECEIT**<br><br>**5) BREACH OF CONTRACT**<br><br>**6) UNJUST ENRICHMENT**<br><br>**7) QUANTUM MERUIT**<br><br>**DEMAND FOR A JURY TRIAL** |

ANTICANCER, INC. ("AntiCancer"), by and through its counsel, alleges for its Complaint against PDOX, INC., dba CERTIS ONCOLOGY SOLUTIONS ("Certis"); PETER ELLMAN; and DOES 1-10 as follows:

1

# INTRODUCTION

A.   This action seeks to put a stop to a scheme by well-financed, rapacious individuals who saw that the only thing standing between themselves and a cancer treatment goldmine was a 75-year-old award-winning scientist and his financially struggling biotech company. This suit seeks to recover approximately $25 million in intellectual and physical property, $3 million for unpaid research services rendered by AntiCancer, and $112,500 for unpaid fees under the parties' Services Agreement.

## The Tumor Bank.

B.   Early one Sunday morning, Peter Ellman, the CEO of a newly formed biomedical company now calling itself Certis Oncology Solutions, entered the laboratory of a decades-old biotech company he'd been doing business with over the last two years named AntiCancer, Inc. When the lone AntiCancer employee present that day expressed surprise at seeing Ellman at the lab so early on a Sunday morning, Ellman explained that he and a few custodial workers he'd brought with him were there to clean up Certis's portion of the lab in anticipation of an upcoming inspection.

C.   That was a flat-out lie.

D.   Ellman waited for the AntiCancer employee to leave, and walked with him out to the front of the building to ensure he was gone.

E.   Then Ellman and his workers got to work clearing everything that belonged to Certis out of the lab. But Ellman also removed something he knew absolutely didn't belong to Certis.

F.   It was something Ellman knew was worth more than everything else in the building: A tumor bank valued at more than $25 million.

G.   The tumor bank consisted of around 220 patient samples of cryopreserved tumor samples, stored in two pressurized, deep-freeze stainless steel containers. These tumor samples were painstakingly collected and preserved by AntiCancer,

COMPLAINT AND DEMAND FOR JURY TRIAL

starting long before Ellman appeared on the scene. Most of the tumors in the bank were so-called "immortalized," meaning they had been established in mice using AntiCancer's decades-old process. Immortalized tumors can be cryopreserved, thawed out, and regrown in mice potentially limitless times to create extremely valuable samples for resale to pharmaceutical and biotech companies.

### The "Partnership".

H.     The ill-fated business relationship between AntiCancer and Certis—akin to a partnership but expressly agreed to be an arms-length independent contractor relationship—started in the fall of 2015, when Fritz Eilber, a surgical oncologist at UCLA met AntiCancer's CEO, Robert Hoffman. Eilber offered to partner with AntiCancer to create a tumor bank, but only if there was "BIG money" in it for him.

I.     Eilber had seen what AntiCancer's technology was capable of accomplishing after being involved with AntiCancer's research related to a family member of James Berglund, the chairman of the board of Certis. AntiCancer had successfully established the tumor of Berglund's family member in its PDOX® mouse model and had tested various treatments.

J.     Berglund and Eilber convinced AntiCancer to create a new company to commercialize the method and hire Ellman as the CEO. AntiCancer, as Ellman, Berglund, and Eilber knew, was in dire financial straits at the time.

K.     The arrangement was promoted to AntiCancer as a sort of partnership or joint venture which would help AntiCancer turn around its financial situation in a big way. (Indeed, to this day Certis calls itself a "spinout" of AntiCancer.) But the parties' Services Agreement expressly labels the arrangement as an independent contractor relationship.

L.     AntiCancer was given forty percent of the newly formed company, PDOX, Inc., which initially used the dba "AntiCancerPDOX." At first the arrangement

seemed to hold promise for AntiCancer. But a fair business relationship wasn't what Certis and Ellman were after.

### The PDOX Mark and Technology.

M.   "PDOX" is AntiCancer's registered trademark, which was never sold, assigned, or licensed to Certis. It's been used by AntiCancer to market its technology for years before the events which gave rise to this action.

N.   PDOX® stands for "Patient Derived Orthotopic Xenograft," which is a technical way of describing AntiCancer's mouse models of human cancer, a technology patented by AntiCancer in 1996. *The New York Times* profiled the patent on March 4, 1996, describing the technology as a way to "ease attachment of tumors to mice, making them 'little cancer patients.'"

O.   PDOX is a method for studying cancer's response to various anti-cancer treatments, using a tumor fragment excised from a patient and orthotopically ("in the right place") grafted from that human patient, by way of a tumor fragment, onto the correct or corresponding organ of a foreign ("xeno") species—in this case, a mouse. Thus, for example, a fragment of tumor from a cancer patient with liver cancer is surgically implanted onto the liver of specialized mice, which are then treated with various chemotherapies at the direction of the patient's oncologist.

P.   The PDOX technique may one day may become part of the standard treatment for all cancer patients, even paid for by health insurance.

Q.   And the tumor bank that develops as a corollary to PDOX research is extremely valuable as a source of research material for pharmaceutical and biotech companies. Indeed, a well-stocked tumor bank like the one Certis took from AntiCancer is currently worth far more than the potential commercial value of the PDOX® service for patients.

//

//

4

## **Certis's Scheme.**

R.      Ellman, Eilber, and Berglund had been seeing dollar signs for two years, but it wasn't until December 2017—two months before absconding with the tumor bank—that they realized just how extremely valuable the tumor bank was. That was when a competitor in the tumor bank business known as Crown Biosciences was sold for $400 million. Seeing this huge sale, their greed got the better of them, and they decided that they were better off shunting AntiCancer to the side rather than keeping the company as a business partner. They decided to take the tumor bank and leave AntiCancer high and dry.

S.      They brought in a scientist who repeatedly tried to get AntiCancer employees to teach him trade secrets. They demanded extensive and labor-intensive concordance studies, the data from which they advertise to this day as their own, though they never paid for the studies. They used and continue to use AntiCancer's trademark without permission, and until recently praised the contributions of AntiCancer and Hoffman on their promotional materials and to investors—at the same time they were secretly planning to throw AntiCancer overboard. They even withheld payments they clearly owed AntiCancer under the parties' Services Agreement, knowing that AntiCancer was in dire need of the money. They voted Hoffman off Certis's board and tried to get him to sell AntiCancer's shares for far less than they are worth.

T.      In sum, they took for themselves all the fruit of AntiCancer's years of painstaking and groundbreaking research and development—without providing any of the promised benefits of the business venture to AntiCancer.

U.      And finally, they took the most valuable thing of all—the tumor bank. This bank is essential to AntiCancer's cancer patient treatment services as well as the performance of a National Cancer Institute research grant awarded to AntiCancer.

V.      Less than two weeks after their Sunday morning theft of the tumor bank, Certis sent a letter purporting to terminate its agreement with AntiCancer. The

COMPLAINT AND DEMAND FOR JURY TRIAL

company then changed its original dba name from "AntiCancerPDOX" to Certis and removed Hoffman from the board—thus airbrushing out AntiCancer's essential contributions to their business model entirely.

W.    Certis and Elllman had finally gotten everything they wanted. They'd taken the tech, the tumors, and the good name of AntiCancer, as well as it's valuable "PDOX" trademark. Only when they'd stripped AntiCancer clean and there was nothing left to take did they execute the final stage of their scheme by terminating the agreements between the two companies and cutting off all ties with AntiCancer.

X.    This action is the direct result of, and the means of redressing, this unlawful scheme.

### NATURE OF THE ACTION

1.    This is an action under (1) the trademark laws of the United States, 15 U.S.C. §§ 1051, et seq., for trademark infringement, false designation of origin, and unfair competition; (2) the common laws of California for conversion, breach of contract, unjust enrichment, and fraud and deceit.

### JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction over AntiCancer's claims pursuant to 15 U.S.C. § 1121 (actions arising under the Federal Trademark Act); 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332 (diversity), 28 U.S.C. §1338 (acts of Congress related to trademarks and pendent claims), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

3.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c), as the events giving rise to this claim occurred within this district; a substantial part of the property that is the subject of this action is situated in this district; the Services Agreement choice of law provision is San Diego, California; defendant PDOX, Inc.'s principal place of business is in this district; and all

COMPLAINT AND DEMAND FOR JURY TRIAL

individual defendants are domiciled and subject to personal jurisdiction in this district.

**THE PARTIES**

4.      Plaintiff AntiCancer, Inc. ("AntiCancer") is a corporation organized and existing under the laws of the State of California and having as its principal place of business San Diego, California.  AntiCancer, which was founded in 1984, developed experimental mouse models of cancer using patient tumors for use in individualized patient-directed research, and has spent years collecting and preserving patient tumor samples.

5.      Defendant PDOX, LLC, dba Certis Oncology Solutions ("Certis") is a limited liability corporation organized and existing under the laws of the State of Delaware and having as its principal place of business San Diego, California. It was founded in 2016.

6.      Defendant Peter Ellman is a natural person and the CEO of PDOX. He resides in San Diego, California.

7.      The true names and capacities, whether individual, corporate, associate, representative or otherwise, of DOES 1 through 10, inclusive, are unknown to plaintiff, who therefore sues them by such fictitious names.  Plaintiff will seek leave to amend this complaint to show the true names and capacities of said defendants when they are ascertained.  Plaintiff is informed and believes, and thereupon alleges, that each of the defendants named as a Doe, along with the named defendants, is responsible in some manner for the occurrences herein alleged, and that plaintiff's injuries herein alleged were legally or proximately caused by said defendants.  Wherever it is alleged that any act or omission was also done or committed by any specifically named defendant, or by defendants generally, plaintiff intends thereby to allege, and does allege, that the same act or omission was also done and committed by each and every defendant named as a

COMPLAINT AND DEMAND FOR JURY TRIAL

Doe, and each named defendant, both separately and in concert or conspiracy with the named defendants.

8.      At all times mentioned herein, defendants, and each of them, were the agents, servants, co-conspirators, or employees of one another, and the acts and omissions herein alleged were done or suffered by them, acting individually and through or by their alleged capacity, within the scope of their authority.  Each of the defendants aided and abetted and rendered substantial assistance in the accomplishment of the acts complained of herein.  In taking the actions, as particularized herein, to aid and abet and substantially assist in the commission of the misconduct complained of, each defendant acted with an awareness of his, her or its primary wrongdoing and realized that his, her or its conduct would substantially assist in the accomplishment of that misconduct and was aware of his, her or its overall contribution to, and furtherance of the conspiracy, common enterprise, and common course of conduct.  Defendants' acts of aiding and abetting included, *inter alia*, all of the acts each defendant is alleged to have committed in furtherance of the conspiracy, common enterprise, and common course of conduct complained of herein.

## FIRST CLAIM FOR RELIEF

### Infringement of Federally Registered Trademark 15 U.S.C. § 1114(1)(a)

(Against Certis)

9.      AntiCancer realleges and incorporates each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

10.      AntiCancer has used its federally registered PDOX mark (Reg. No. 4,516,322; Application Filing Date May 20, 2013) in commerce in connection with its products and services. Attached hereto as Exhibit 1 is a true and correct copy of AntiCancer's registration certificate. Certis had both actual and constructive

8

knowledge of AntiCancer's ownership of and rights in its federally registered mark prior to Certis's infringing use of that mark.

11.     Certis adopted and continue to use in commerce AntiCancer's federally registered mark, and marks confusingly similar, with full knowledge of AntiCancer's superior rights, and with full knowledge that their infringing use of AntiCancer's mark was intended to cause confusion, mistake and/or deception. Certis even claims the mark is its own. See Exhibit 2 attached hereto.

12.     Certis offers its goods and services under the infringing marks in the same channels of trade as those in which AntiCancer's legitimate goods and services are offered.

13.     Certis's infringing use of AntiCancer's mark is likely to cause, and has caused, confusion, mistake or deception as to the affiliation, connection or association of Certis's goods and services with AntiCancer, in violation of 15 U.S.C. § 1114.

14.     Certis's actions constitute knowing, deliberate, and willful infringement of AntiCancer's federally registered mark. The knowing and intentional nature of the acts set forth herein renders this an exceptional case under 15 U.S.C. § 1117(a).

15.     As a result of Certis's infringement, AntiCancer has suffered substantial damages, as well as the continuing loss of the goodwill and reputation established by AntiCancer in its federally registered mark. This continuing loss of goodwill cannot be properly calculated and thus constitutes irreparable harm and an injury for which AntiCancer has no adequate remedy at law. AntiCancer will continue to suffer irreparable harm unless this Court enjoins Certis's conduct.

## SECOND CLAIM FOR RELIEF
### Federal False Designation of Origin and
### Unfair Competition 15 U.S.C. § 1125(a)

(Against Certis)

16.     AntiCancer realleges and incorporates each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

17.     Certis has deliberately and willfully attempted to trade on AntiCancer's goodwill in its mark and the reputation established by AntiCancer in connection with its products and services, as well as in order to confuse consumers as to the origin and sponsorship of Certis's goods and services and to pass off its products and services in commerce as those of AntiCancer.

18.     Certis's unauthorized and tortious conduct has also deprived and will continue to deprive AntiCancer of the ability to control the consumer perception of its products and services offered under AntiCancer's marks, placing the valuable reputation and goodwill of AntiCancer in the hands of Certis.

19.     Certis's conduct is likely to cause confusion, mistake or deception as to the affiliation, connection or association of Certis's goods and services with AntiCancer, and as to the origin, sponsorship or approval of Certis and its products and services, in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1).

20.     Certis had direct and full knowledge of AntiCancer's prior use of and rights in its mark before the acts complained of herein. The knowing, intentional and willful nature of the acts set forth herein renders this an exceptional case under 15 U.S.C. § 1117(a).

21.     As a result of Certis's aforesaid conduct, AntiCancer has suffered commercial damage, as well as the continuing loss of the goodwill and reputation established by AntiCancer in its mark. This continuing loss of goodwill cannot be properly calculated and thus constitutes irreparable harm and an injury for which AntiCancer has no adequate remedy at law. AntiCancer will continue to suffer irreparable harm unless this Court enjoins Certis's conduct.

/ /

/ /

COMPLAINT AND DEMAND FOR JURY TRIAL

## THIRD CLAIM FOR RELIEF

### Conversion

(Against All Defendants)

22.     AntiCancer realleges and incorporates each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

23.     Defendants willfully interfered with AntiCancer's rights to its personal property. Defendants willfully interfered through a fraudulent scheme to induce AnrtiCancer to give them access to all of AntiCancer's personal property, including its tumor bank of patient samples.

24.     Defendants' intentional, willful, and deceitful acts enabled them to dispose of AntiCancer's property, including the tumor bank, in a manner wholly inconsistent with AntiCancer's property rights.

25.     Defendants' unauthorized transfer of AntiCancer's property caused substantial damages to AntiCancer.

## FOURTH CLAIM FOR RELIEF

### Fraud and Deceit

(Against All Defendants)

26.     AntiCancer realleges and incorporates each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

27.     Defendants commenced a fraudulent plan and a continuing course of conduct aimed at inducing AntiCancer to provide tumor samples, concordance studies, know-how, and other valuable intellectual and physical property and services to Defendants for the purpose of using those properties and services to create and market its own products and services.

28.     In furtherance thereof, Defendants made multiple false and misleading statements of material facts, concealed true facts they were bound to disclose, and

COMPLAINT AND DEMAND FOR JURY TRIAL

omitted to state material facts. Defendants' statements and omissions were false and deceitful, and Defendants knew them to be so.

29.     Specific examples of false or misleading statements of fact and/or omissions of material facts include but are not limited to Defendant Peter Ellman telling an AntiCancer employee that he was "cleaning up" Certis's portion of the lab "to get ready for an inspection," when in fact his purpose for being there was to take AntiCancer's tumor bank. On information and belief, Ellman was acting in his capacity as CEO of Certis as well as in a personal capacity when he made these and other false statements and/or omissions of material facts.

30.     In justifiable reliance on Defendants' statements and omissions, AntiCancer provided goods and services to Certis and allowed Certis and Ellman access to the tumor bank.

31.     Had AntiCancer known the true facts, it would not have provided good and services to Defendants or given Defendants access to the tumor bank or to any other property of AntiCancer. As a direct and proximate result of Defendants' misconduct, AntiCancer has been damaged in an amount to be proven at trial.

32.     Defendants' misconduct was despicable and motivated by and done with malice, fraud, and oppression, thus warranting an award of exemplary damages against the defendants.

### FIFTH CLAIM FOR RELIEF
### Breach of Contract
(Against Certis)

33.     AntiCancer realleges and incorporates each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

COMPLAINT AND DEMAND FOR JURY TRIAL

34.     There exists a valid services agreement between AntiCancer and Certis, dated January 24, 2017 ("Services Agreement"). A true and correct copy is attached hereto as Exhibit 3.

35.     AntiCancer has performed all conditions, covenants, and promises required by it on its part to be performed in accordance with the terms and conditions of the Services Agreement.

36.     Certis has breached the Services Agreement by failing to pay certain Base Monthly Fees, as those fees are defined in the Services Agreement, since at least October 2017, for a total past due of at least $112,500. AntiCancer has requested payment but no payment has been made by Certis.

37.     As a direct and proximate result of Certis's failure to pay the Base Monthly Fees AntiCancer has been damaged in the amount of at least $112,500.

## SIXTH CLAIM FOR RELIEF

### Unjust Enrichment

(Against Certis)

38.     AntiCancer realleges and incorporates each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

39.     Certis has improperly obtained valuable intellectual and physical property from AntiCancer, including but not limited to the tumor bank, the concordance studies data, animal models, tools, know-how, intellectual property rights, information, and processes.

40.     Certis has obtained this intellectual and physical property at AntiCancer's expense and efforts, and as a result of AntiCancer's good faith performance under the Services Agreement.

41.     Certis has not returned any of the intellectual and physical property or made monetary restitution of its value. Certis's unjustified and continuing detention of AntiCancer's intellectual and physical property constitutes unjust

enrichment, and the circumstances are such that in equity and good conscience Certis should return the intellectual and physical property or make monetary restitution of its value, in an amount to be proved at trial.

## SEVENTH CLAIM FOR RELIEF

### Quantum Meruit

(Against Certis)

42.     AntiCancer realleges and incorporates each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

43.     Certis requested services from AntiCancer, including but not limited to the performance of concordance studies and analysis involving thousands of mouse models. Certis agreed to pay AntiCancer for those services. Certis represents to the public in promotional material that it owns the data that resulted from the services.

44.     AntiCancer provided the services Certis requested and in reliance upon Certis's promises to compensate AntiCancer for those services. The reasonable value of those services is at least $3 million. Accordingly, the circumstances are such that in equity and good conscience AntiCancer is entitled to the reasonable value of the products and services AntiCancer provided for Certis for which Certis has not yet paid.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, AntiCancer requests a jury trial of all issues that may be tried to a jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, AntiCancer prays for an Order and Judgment as follows:

1.     Entry of an order (on a preliminary and permanent basis) requiring that Defendants and their officers, agents, servants, employees, owners and

COMPLAINT AND DEMAND FOR JURY TRIAL

representatives, and all other persons, firms or corporations in active concert or participation with them, be enjoined and restrained from:

(a)    Using in any manner the PDOX mark, or any name, mark or domain name that wholly incorporates the PDOX mark or is confusingly similar to or a colorable imitation of this mark;

(b)    Using or displaying the PDOX logo on any websites, products, or promotional materials in any false and/or deceptive manner;

(c)    Using in any manner the PDOX mark, or any name, mark or domain name that wholly incorporates the PDOX mark or is confusingly similar to or a colorable imitation of this mark;

(d)    Doing any act or thing calculated or likely to cause confusion or mistake in the minds of members of the public or prospective customers of AntiCancer's products or services as to the source of the products or services offered for sale, distributed, or sold, or likely to deceive members of the public, or prospective customers, into believing that there is some connection between Defendants and AntiCancer;

(e)    Committing any acts which will tarnish, blur, or dilute, or are likely to tarnish, blur, or dilute the distinctive quality of the PDOX mark; and

(f)    Making any representations, express or implied, that AntiCancer is affiliated with or sponsors or approves of Defendants or their products or services;

2.    Directing Defendants to transfer to AntiCancer (at no cost to AntiCancer) all domain names that contain or consist of AntiCancer's mark, including but not limited to www.anticancerpdox.com;

3.    Ordering Defendants to preserve through trial and then deliver up for destruction, pursuant to 15 U.S.C. § 1118, all Internet webpages/scripts/html code, articles, packages, wrappers, products, displays, labels, signs, vehicle displays or signs, circulars, kits, packaging, letterhead, business cards, promotional items,

COMPLAINT AND DEMAND FOR JURY TRIAL

clothing, literature, sales aids, receptacles, templates or other matter in the possession, custody, or under the control of Defendants or its agents bearing the PDOX word mark or any mark that is confusingly similar to or a colorable imitation of this mark;

4.       Ordering Defendants to take all steps necessary to cancel any state or local business registrations, including corporate name registrations and dba filings, that include AntiCancer's mark or amend those registrations to names that do not include AntiCancer's mark, and to remove any references to any business registrations, including corporate names and dba filings, that include AntiCancer's mark;

5.       Ordering Defendants to retain and disclose all communications with all individuals and entities with whom they engaged in any transaction relating to or arising from the use of AntiCancer's mark, or otherwise in furtherance of the scheme alleged herein;

6.       Directing Defendants to provide an accounting of profits made by Defendants as a result of Defendants' unlawful conduct;

7.       Ordering Defendants, pursuant to 15 U.S.C. § 1116(a), to file with this Court and serve upon AntiCancer within thirty (30) days after entry of the injunction a written report under oath describing in detail the manner and form in which Defendants have complied with the injunction, including ceasing all offering of services under AntiCancer's mark as set forth above;

8.       Ordering Defendants to pay a judgment in the amount of AntiCancer's actual damages under 15 U.S.C. § 1117 and California law, as well as Defendants' profits, and pre- and post-judgment interest pursuant to 15 U.S.C. § 1117, in an amount to be proven at trial;

9.       Ordering Defendants to pay AntiCancer's reasonable attorneys' fees and costs of this action under 15 U.S.C. § 1117 and/or California law;

16

10.     Ordering Defendants to pay a judgment for enhanced damages under 15 U.S.C. § 1117 and punitive damages under California law as appropriate;

11.     Ordering monetary restitution for defendants' conversion and fraud and deceit related to the theft of AntiCancer's tumor bank, in an amount no less than approximately $25 million;

12.     Ordering Certis to pay in *quantum meruit* all amounts owed to AntiCancer, not less than $3 million;

13.     Ordering Certis to pay amounts due under the Services Agreement, not less than $112,500;

14.     Ordering an award of exemplary and punitive damages and attorneys fees for Defendants' conversion and fraud and deceit;

15.     Granting AntiCancer such other and further relief as the Court deems just and proper.


Respectfully submitted this 6th day of July, 2018.


THE LAW OFFICE OF MATT VALENTI


By:     s/ Matt Valenti
        Matt Valenti
        Attorney for Plaintiff AntiCancer, Inc.
        Email: mattvalenti@outlook.com

COMPLAINT AND DEMAND FOR JURY TRIAL

# EXHIBIT 1

# United States of America
## United States Patent and Trademark Office

# PDOX

**Reg. No. 4,516,322**

**Registered Apr. 15, 2014**

ANTICANCER, INC. (CALIFORNIA CORPORATION)
7917 OSTROW STREET
SAN DIEGO, CA 92111

**Int. Cls.: 42 and 44**

**SERVICE MARK**

**PRINCIPAL REGISTER**

FOR: MEDICAL AND SCIENTIFIC RESEARCH IN THE FIELD OF CANCER TREATMENT AND DIAGNOSIS; MEDICAL RESEARCH SERVICES IN THE FIELD OF CANCER; PROVIDING LABORATORY RESEARCH SERVICES IN THE FIELD OF GENE EXPRESSION, NAMELY, CANCER BIOLOGY; PROVIDING MEDICAL TESTING SERVICES AND INFORMATION IN THE FIELD OF CANCER RESEARCH AND DISEASE CLASSIFICATION; SCIENTIFIC RESEARCH FOR MEDICAL PURPOSES IN THE AREA OF CANCEROUS DISEASES; SCIENTIFIC RESEARCH FOR MEDICAL PURPOSES IN THE FIELD OF CANCER, IN CLASS 42 (U.S. CLS. 100 AND 101).

FIRST USE 6-1-2013; IN COMMERCE 6-1-2013.

FOR: HEALTH CARE SERVICES FOR TREATING CANCER; MEDICAL EVALUATION OF CANCER, IN CLASS 44 (U.S. CLS. 100 AND 101).

FIRST USE 6-1-2013; IN COMMERCE 6-1-2013.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SN 85-937,218, FILED 5-20-2013.

SEAN CROWLEY, EXAMINING ATTORNEY



**Deputy Director of the United States Patent and Trademark Office**

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL
TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten Years\***
**What and When to File:**

> *First Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) between the
> 5th and 6th years after the registration date.  *See* 15 U.S.C. §§1058, 1141k.  If the declaration is
> accepted, the registration will continue in force for the remainder of the ten-year period, calculated
> from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a
> federal court.

> *Second Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) **and** an
> Application for Renewal between the 9th and 10th years after the registration date.\*
> *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse)  **and** an Application for Renewal between
> every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above
with the payment of an additional fee.

---

**The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or
reminder of these filing requirements.**

---

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:**  The holder of an international registration with
an extension of protection to the United States under the Madrid Protocol must timely file the Declarations
of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are
based on the U.S. registration date (not the international registration date).  The deadlines and grace periods
for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations.
*See* 15 U.S.C. §§1058, 1141k.  However, owners of international registrations do not file renewal applications
at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the
International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol,
before the expiration of each ten-year term of protection, calculated from the date of the international
registration.  *See* 15 U.S.C. §1141j.  For more information and renewal forms for the international registration,
see http://www.wipo.int/madrid/en/.

**NOTE:   Fees and requirements for maintaining registrations are subject to change.   Please check the
USPTO website for further information.   With the exception of renewal applications for registered
extensions of protection, you can file the registration maintenance documents referenced above online
at** http://www.uspto.gov.

# EXHIBIT 2

About Us | PDOX (AntiCancer PDOX)



ABOUT PDOX ⌄        PRE-CLINICAL RESEARCH ⌄        SC

## ABOUT CERTIS ONCOI

Certis Oncology was formed in 2016 as a spinout of Ar



 Oncology was formed in 2016 as a spinout of AntiCancer, Inc.

ncer is the oldest free-standing biotechnology company in San Diego. AntiCancer developed, pionee the PDOX® technique.

Certis Oncology has an exclusive worldwide license from AntiCancer for all patents and technology related scientists to track tumor and metastatic growth, are being licensed to AntiCancer PDOX.

Certis Oncology is affiliated with leading cancer physicians from UCLA and UCSD. The PDOX technique has journals.

For more information on Certis Oncology, please contact us.

CONTACT US



## ABOUT CERTIS ONCOLOGY SOLUTIONS

Certis Oncology was formed in 2016 as a spinout of AntiCancer, Inc.

AntiCancer is the oldest free-standing biotechnology company in San Diego. AntiCancer
 ed, pioneered and patented the MetaMouse® model, which is the basis for the PDOX®
ue.

Oncology has an exclusive worldwide license from AntiCancer for all patents and
ogy related to patient therapy. Fluorescence imaging patents, which allow scientists to
mor and metastatic growth, are being licensed to AntiCancer PDOX.

Certis Oncology is affiliated with leading cancer physicians from UCLA and UCSD. The PDOX
technique has been validated in more than 500 articles in peer-reviewed journals.

For more information on Certis Oncology, please contact us at info@certisoncology.com.

## CONTACT INFORMATION

Certis Oncology Solutions

4940 Carroll Canyon Rd., Suite 120

San Diego, CA 92121

(T) 858-952-1820

(F) 858-952-0513

info@certisoncology.com

## CONTACT US

Your name (required)

Your email (required)

Your primary phone:

I am a:

Cancer Patient

Please check all that

☐ I would like to r

☐ I would like som

SEND

Copyright © 2018, PDOX® is a registered trademark of Certis Oncology. AntiCancer® and MetaMouse® are registered tr
Personalized Medical Solutions for Cancer Therapy™ , and Patient Derived Orthotopic Xenografts ™ are trademarks of Ce

# EXHIBIT 3

**SERVICES AGREEMENT**

This Services Agreement (this "**Agreement**") is entered into as of January 24, 2017 (the "**Effective Date**") between AntiCancer, Inc. a California corporation ("**AntiCancer**"), having an address at 7917 Ostrow Street, San Diego, CA 92111 (the "**Premises**"), and PDOX, Inc. a Delaware corporation having an address at 7917 Ostrow Street, San Diego, CA 92111 ("**Company**"). The parties hereby agree as follows:

1.      Engagement of Services.  AntiCancer will provide the services described on Exhibit A attached hereto (the "**Services**"), and will do so in a timely and professional manner and in accordance with all applicable laws.  During the term of this Agreement, AntiCancer will provide PDOX Services (as defined in Exhibit A) to Company on an exclusive basis in North America (even as to AntiCancer), provided that the parties acknowledge and agree that AntiCancer may continue to perform Contract Services (as defined in Exhibit A) on its own behalf during the term of this Agreement.  Company agrees that through the fourth anniversary of the Effective Date, no third party will perform any PDOX Services for Company for so long as AntiCancer can perform the PDOX Services.  In the future, the parties may desire to have additional services performed and governed by this Agreement, in which case the parties will mutually execute a work order, or other similar document, that describes such services and references this Agreement.

2.      Required Certifications.  Company shall use reasonable efforts to secure all federal, state or other certifications approvals or authorizations required to perform the Services at the Premises, including those required by the Clinical Laboratory Improvement Amendments of 1988 (CLIA) (the "**Required Certifications**").  AntiCancer agrees to provide materials and information reasonably requested by Company in support of obtaining the Required Certifications and AntiCancer agrees to provide such other cooperation and assistance as reasonably required to obtain the Required Certifications. Company shall promptly notify AntiCancer of the date upon which all of the Required Certifications are complete (the "**Certification Date**").  Company will bear all costs related to securing the Required Certifications; including the payment of the fees and expenses of any consultant(s) engaged by Company to assist in Company's efforts to obtain the Required Certifications.

3.      Facility Use.  AntiCancer shall allocate to Company for its primary use the portion of the Premises shown in Exhibit B attached hereto comprised of approximately 3,000 square feet (the "**PDOX Space**").  Following the Effective Date, AntiCancer agrees to make various improvements to the condition of the Premises (including the PDOX Space) as reasonably requested by Company, provided that the cost of such improvements will be the responsibility of Company.  The parties shall use reasonable efforts to ensure that, as soon as is practicable, the PDOX Space and the common areas of the Premises, such as the lunch room, bathrooms and reception area, shall present a reasonably professional image to visitors including patients, caregivers, PDOX employees, consultants and investors ("**PDOX Invitees**").  Company acknowledges and agrees that the permission granted by this Section 3 is merely a revocable license granted by AntiCancer to Company and the PDOX Invitees to enter and use the PDOX Space for the limited duration of this Agreement.  This Agreement does not constitute a lease and Company acquires no leasehold interest pursuant to its terms.  Company further acknowledges that the foregoing license expires immediately upon the termination of this Agreement, and that upon termination of this Agreement, Company and all PDOX Invitees shall leave the Premises.  Company agrees that it will be responsible to any damages or losses at the Premises caused by Company or its employees, officers, contractors, agents or PDOX Invitees, reasonable wear and tear excepted.

4.      Compensation; Timing; Auditing.

4.1     Company will pay AntiCancer the fees set forth on Exhibit A.  Unless otherwise provided in Exhibit A, payment for Services shall be made to AntiCancer on a monthly basis no later than the fifth business day of the month in which such Services are to be performed.

4.2     During the term of this Agreement and for a period of one calendar year afterwards, AntiCancer shall have the right to audit the books and records of Company that are relevant to any calculations for fees paid to AntiCancer pursuant to this Agreement.  Such audits may occur upon reasonable notice and during typical business hours and AntiCancer may not conduct more than one (1) audit during any calendar year.  In the event that an audit determines that Company underpaid fees owed to AntiCancer by an amount which is greater than five percent (5%) of what was actually owed, then all fees and expenses incurred by AntiCancer in connection with such audit will be reimbursed by Company.

5.      Independent Relationship.  AntiCancer's relationship with Company is that of an independent contractor, and nothing in this Agreement is intended to, or shall be construed to, create a partnership, agency, joint venture or similar relationship.  AntiCancer is not authorized to make any representation, contract or commitment on behalf of Company unless specifically requested or authorized in writing to do so by Company.

6.      Deliverables.

6.1     "**Deliverables**" shall mean all materials, data, work product, results, reports and any other information generated or derived by AntiCancer in connection with the performance of the Services hereunder.

6.2     Subject to Section 6.3 below, AntiCancer agrees that all Deliverables created or developed by AntiCancer under this Agreement shall be deemed "works for hire" and shall be the sole and exclusive property of Company. AntiCancer assigns to Company all of its right, title and interest, including copyrights, patents, and any other intellectual, industrial or proprietary property rights in all aspects of such Deliverables, including any derivative works.

6.3     Notwithstanding Section 6.2 above, AntiCancer may, in the course of fulfilling its obligations under this Agreement, utilize tools, know-how, intellectual property rights, software and other information or processes that are owned and/or acquired by AntiCancer prior to the execution of this Agreement or owned and/or acquired by AntiCancer subsequent to the execution of this Agreement not in connection with the performance of the Services, and/or may make improvements, alterations, or other changes to same during the term of this Agreement (the "**Proprietary Information**").  AntiCancer owns and shall continue to own all rights to the Proprietary Information, and shall not be deemed to have abandoned or surrendered any such rights by any provision of this Agreement.  To the extent that the Deliverables contain any Proprietary Information, AntiCancer hereby grants Company a non-exclusive, worldwide, perpetual, royalty free license to use such Proprietary Information within the Deliverables, provided that such license will not extend to any use of the Proprietary Information which in any manner competes with, or otherwise harms, AntiCancer.

7.      Confidentiality.  "**Confidential Information**" means any information related to Company's or AntiCancer's business, respectively, and current, future and proposed products and services and information concerning the Deliverables, the Proprietary Information, or either party's product development, software code, research, development, financial information, customer lists, business forecasts, sales information or marketing plans.  Except as permitted in this Section, neither party shall use, disseminate or in any way disclose Confidential Information of the other party to any third party.  Each party shall use Confidential Information of the other party solely as required to perform its obligations under this Agreement.  Each party shall disclose Confidential Information only to those of its

employees who have a need to know such information and who have agreed, either as a condition of employment or in order to obtain the Confidential Information, to be bound by terms and conditions at least as protective as those terms and conditions applicable to such party under this Agreement. Each party shall immediately give notice to the other of any unauthorized use or disclosure of such other party's Confidential Information. Each party shall assist the other in remedying any such unauthorized use or disclosure of Confidential Information. Neither party will communicate any information to the other in violation of the proprietary rights of any third party.

8.      Ownership and Return of Confidential Information and Company Property.  All Confidential Information and any materials (including, without limitation, documents, drawings, papers, diskettes, tapes, models, apparatus, sketches, designs and lists) furnished by a party to the other party, whether or not they contain or disclose Confidential Information (collectively, "**Property**"), are the sole and exclusive property of such furnishing party.  Within five (5) days after any request by a furnishing party, the other party shall destroy or deliver to the furnishing party, at its option, (a) all Property and (b) all materials in such other party's possession or control that contain or disclose any of the other party's Confidential Information.

9.      Term and Termination.  This Agreement shall remain in effect indefinitely, provided that Company may terminate this Agreement without cause at any time, with termination effective six (6) months after delivery to AntiCancer of written notice of termination, provided that such termination date may not be earlier than the date that is four (4) years after the Effective Date.  AntiCancer may terminate this Agreement without cause at any time, with termination effective twelve (12) months after delivery to the other party of written notice of termination provided that such termination date may not be earlier than the date that is five (5) years after the Effective Date.  In addition, AntiCancer may terminate this Agreement at any time after the six (6) month anniversary of the Effective Date in the event that the Company Funding Event (as defined in Exhibit A) has not occurred, provided that once such Company Funding Event has occurred, the right to terminate pursuant to this sentence shall lapse.  Notwithstanding the foregoing, either party may terminate this Agreement upon the delivery of a written notice to the other party in the event of a material breach of the Agreement by the other party which remains uncured thirty (30) days after the delivery of a written notice of breach (describing the breach in reasonable detail) from the non-breaching party to the breaching party.  Either party may terminate this Agreement upon the other's Insolvency, effective upon the delivery of a written notice to the other party.  "**Insolvency**" in this context shall mean: (i) commencement by or against a party of insolvency, receivership, bankruptcy or similar proceeding for the settlement of the party's debts, which if the proceedings are commenced by a third party, are not dismissed within 90 days of filing; (ii) a party making an assignment for the benefit of creditors; or (iii) a party's dissolution or ceasing to do business.  Upon termination of this Agreement, Company shall pay AntiCancer for all Services rendered and for any non-refundable expenses incurred by AntiCancer in anticipation of providing Services.  The rights and obligations contained in this Section and Sections 5, 6, 7, 8, 10 and 12 will survive any termination or expiration of this Agreement.  During the term of this Agreement and for a period of one year after its termination, Company will not directly or indirectly solicit, encourage, or cause others to solicit or encourage any employees of AntiCancer to terminate or materially alter their arrangements or relationships with AntiCancer.

10.     Indemnification.

        10.1    Company shall indemnify and hold AntiCancer and its employees, agents and contractors (each, a "AntiCancer Indemnitee") harmless from any and all liabilities, costs and expenses (including reasonable attorneys' fees and court costs) ("Losses") arising from any third party claim, action, lawsuit, investigation or other proceeding (each, a "Claim") to the extent such Claims result from: (i) the unauthorized use by a Company Indemnitee (as defined below) of the Deliverables, the Proprietary Information, any third party technology or any other information or technology provided by AntiCancer,

in contravention of this Agreement; (ii) the negligence or misconduct of a Company Indemnitee; or (iii) a breach of this Agreement by a Company Indemnitee.

        10.2    AntiCancer shall indemnify and hold Company and its employees, agents and contractors (each, a "Company Indemnitee") harmless from any Losses arising from Claims to the extent such Claims result from: (i) an AntiCancer Indemnitee's unauthorized use of the Deliverables, the Proprietary Information, any third party technology or any other information or technology provided by Company, in contravention of this Agreement; (ii) the negligence or misconduct of an AntiCancer Indemnitee; or (iii) a breach of this Agreement by an AntiCancer Indemnitee.

11.    <u>Notification of Unpaid Obligations</u>.  During the term of this Agreement, AntiCancer agrees that in the event that it either (i) is unable to pay a Material Obligation when due or (ii) concludes that it will be unable to pay a Material Obligation when such obligation will be due, it will promptly (but in no event later than two business days) notify Company in writing (an "Unpaid Obligation Notice").  "Material Obligation" means any AntiCancer obligation that, if unpaid, is reasonably likely to jeopardize AntiCancer's ability to perform the Services or Company's ability to get the full use and enjoyment of the PDOX Space.  Material Obligations include, but are not limited to, the following obligations: (a) rent, (b) utilities, (c) payments to employees, (d) taxes, (e) payments to vendors, and (f) payments to creditors. AntiCancer authorizes Company to contact the party otherwise entitled to the Material Obligation and, at Company's discretion, to pay such Material Obligation on AntiCancer's behalf.  AntiCancer agrees that any such payments made by Company will be credited against future amounts owed by Company to AntiCancer pursuant to the terms of <u>Exhibit A</u>.  Each Unpaid Obligation Notice will include: (X) the name and contact information of the party entitled to the Material Obligation, (Y) the amount of the Material Obligation, and (Z) supporting documentation to reasonably allow Company to verify the Material Obligation.

12.    <u>General Provisions</u>.  This Agreement will be governed in all respects under the laws of the state of California, and the venue for any dispute arising out of, or in connection with, this Agreement shall be the state and federal courts located in San Diego, California.  All notices and communications under this Agreement shall be in writing to the applicable address set forth above, provided that a party may change the applicable address for future notices pursuant to the terms of this sentence.  AntiCancer's obligations under this Agreement are of a unique character that gives them particular value.  This Agreement and a party's rights and obligations hereunder may not be assigned by a party except with the prior written approval of the other party, provided that a party may assign its rights and obligations to a third party in connection with a change in control of such party or the sale of all or substantially all of the assets of such party so long as the assignee agrees in writing to be bound by the terms and conditions of this Agreement. This Agreement will bind and inure to the benefit of each party's respective successors and permitted assigns.  This Agreement may only be modified or amended by a written agreement signed by both of the parties. If any provision of this Agreement is found to be unenforceable, the remainder of this Agreement will continue in full force and effect.  The failure of either party to require performance by the other of any provision hereof shall not affect the full right to require such performance at any time thereafter; nor shall the waiver by either party of a breach of any provision hereof by the other be taken or held to be a waiver of the provision itself.  This Agreement constitutes the entire agreement between the parties relating to this subject matter and supersedes all prior or contemporaneous agreements concerning such subject matter, written or oral.

IN WITNESS WHEREOF, the parties have executed this Services Agreement as of the Effective Date.

**Company:  PDOX, Inc.**

By: _____  1/24/2017

Name: _Peter Ellman_

Title: _CEU_

**AntiCancer:  AntiCancer, Inc.**

By: _Robert Hoffman_

Name: _____

Title: _President & CEO_

EXHIBIT A

SERVICES; FEES

Services

AntiCancer shall perform PDOX Services (as defined below) and Contract Services (as defined below) necessary to support Company's patient-derived xenograft and contract services business (the "**Business**"). "**PDOX Services**" shall mean (i) patient-derived xenograft drug testing utilizing up to twenty-five (25) mice per test for a duration not to exceed thirty (30) days (additional mice and/or additional test duration will be agreed upon in advance by the parties and the costs of any therapeutics used in such tests will be the responsibility of Company), (ii) tumor banking services which will involve cryopreservation of one tumor per patient receiving PDOX Services, and (iii) such other services as are reasonably requested by Company which do not involve material increases in the costs and expenses incurred by AntiCancer. "**Contract Services**" means non-PDOX Services performed on a contract basis for third parties. PDOX Services and Contract Services are collectively referred to as "**Services**".

AntiCancer will designate an account manager to manage all aspects of the Services performed for Company.

Fees

As payment for all Services, the license granted in Section 3, and other things provided to Company under this Agreement, Company shall pay AntiCancer as follows:

- Beginning with the month following the Company Funding Event (as defined below), Company shall pay a monthly fee amount equal to the greater of (i) the Base Monthly Fee (as defined below) for that month or (ii) the Percentage Fee Total (as defined below) for the prior month (the "**Monthly Fee**"). The Monthly Fee will be due and payable on the fifth business day of each calendar month. For example, if the Company Funding Event occurs in January 2017, $12,500 will be due on the fifth business day of February 2017. On the fifth business day of March 2017, an amount equal to the greater of (a) $12,500 or (b) the Percentage Fee Total from February revenues will be due.

- "**Company Funding Event**" means the consummation of a debt or equity financing by the Company which results in gross proceeds, including the conversion of outstanding debt, to the Company of at least $750,000.

- "**Base Monthly Fee**" means: (i) $12,500 beginning in the month following the Company Funding Event; and (ii) $25,000 upon the earlier of (a) the month after the Company receives the Required Certifications or (b) the seventh month after the initial payment of the Base Monthly Fee.

- "**Percentage Fee Total**" means the combination of (A) fifty percent (50%) of Non-Customer Payments (as defined below) received in such month plus (B) thirty-three percent (33%) of Company's Patient Revenue for such month plus (C) the Applicable Contract Revenue Percentage of Contract Revenue for such month. "**Applicable Contract Revenue Percentage**" means (X) forty percent (40%) on the first five million dollars ($5,000,000) of Contract Revenue in a calendar year, (Y) forty-five percent (45%) on the next five million dollars ($5,000,000) of Contract Revenue in a calendar year, and (Z) fifty percent (50%) on all additional Contract Revenue in a calendar year.

- Following Company's receipt of the Required Certifications, if AntiCancer's reasonable costs incurred in connection with the provision of the Services (e.g., labor costs, material costs, etc.) in any particular month exceed the Monthly Fee received by AntiCancer for such month, Company agrees that it will reimburse AntiCancer for the difference between AntiCancer's reasonable costs and the Monthly Fee received for such month. AntiCancer agrees that it will provide sufficient documentation to Company to verify its reasonable costs for a particular month and Company agrees to make such reimbursement payment to AntiCancer within thirty (30) days of receiving such documentation.

- **"Patient Revenue"** shall mean all amounts received from Company's individual customers in connection with the patient-derived xenograft portion of the Business, net of discounts, refunds and similar adjustments, and not including taxes other than Excluded Amounts. "**Excluded Amounts**" shall mean: (i) prior to the fourth anniversary of the Effective Date, amounts received from Company's individual customers in connection with the patient-derived xenograft portion of the Business which result from services performed by the Company or a third party at a site other than AntiCancer's Primary Facility (as defined below) due to the Primary Facility exceeding Maximum Capacity (as defined below), and (ii) after the fourth anniversary of the Effective Date, amounts received from Company's individual customers in connection with the patient-derived xenograft portion of the Business which result from services performed by the Company or a third party at a site other than AntiCancer's Primary Facility. "**Primary Facility**" means the primary facility where AntiCancer provides Services to Company pursuant to the Agreement, which shall initially be the Premises, provided that during the term of this Agreement AntiCancer will have the right to expand or otherwise add to the Primary Facility. "**Maximum Capacity**" means the maximum volume of Business that AntiCancer can support under this Agreement at the Primary Facility (as determined by AntiCancer's ability to comply with the terms of this Agreement).

- "**Contract Revenue**" shall mean all amounts received from third parties in connection with the Contract Services portion of the Business, net of discounts, refunds and similar adjustments, and not including taxes. For a period of three (3) years following the Effective Date, Company agrees that it shall not enter into any agreement for the performance of Contract Services with any Excluded Client without the prior written consent of AntiCancer.

- "**Excluded Client**" means those third parties for whom AntiCancer has performed Contract Services during the three (3) year period prior to the Effective Date as identified and disclosed to Company within thirty (30) days of the Effective Date.

- "**Non-Customer Payments**" means the aggregate amount of donations and externally sponsored scientific research (ESR) payments which directly arise from the development or operation of the Company's Business. AntiCancer acknowledges and agrees that Company shall be entitled to fifty percent (50%) of all Non-Customer Payments during the term of this Agreement.

## EXHIBIT B

## DESCRIPTION OF PDOX SPACE