Michael L. Kirby, Esq. (SBN 50895)
mike@kirbyandkirbylaw.com
**KIRBY & KIRBY LLP**
501 West Broadway, Suite 1720
San Diego, California 92101
Telephone: 619.487.1500
Facsimile: 619.501.5733

**Attorney for Defendants**

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

ANTICANCER, INC.,

Plaintiff,

v.

PDOX, INC., dba CERTIS ONCOLOGY SOLUTIONS, PETER ELLMAN, and DOES 1 to 10,

Defendants.

Case No.: 18-cv-1543-CAB-MDD

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Hearing Date: November 25, 2019

**PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT**

Judge: Hon. Cathy Ann Bencivengo
Dept.: 4C
Magistrate: Mitchell D. Dembin
Dept.: 11th Floor

# TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 5

II. STATEMENT OF FACTS .......... 6

III. LEGAL STANDARD .......... 9

IV. ARGUMENT .......... 10

A. Certis Had an Implied License to Use AntiCancer's Trademarks .......... 10

B. Certis's License to Use AntiCancer's Trademarks Was Not Revoked Until AntiCancer Filed its First Amended Complaint .......... 12

C. AntiCancer Failed to Maintain Control Over its Trademarks, and is Therefore Estopped from Asserting Infringement .......... 13

D. Even if Certis Improperly Used AntiCancer's Trademarks, AntiCancer's Claims Fail Because It Cannot Show Any Actual Damages .......... 14

1. Defendant Has No Revenue or Profits .......... 15

2. Plaintiff Suffered No Actual Damages .......... 17

E. Injunctive Relief is Inappropriate Because Certis Has Always Acted in Good Faith and Has Discontinued Use of AntiCancer's Trademarks .......... 18

V. CONCLUSION .......... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999) ....................10

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).................... 10, 13, 17

*Consolidated Theatres, Inc. v. Theatrical Stage Emp. Union, Local 16*, 69 Cal. 2d 713 (1968) ....................12

*De Forest Radio Telephone Co. v. United States*, 273 U.S. 236 (1927).................... 10, 11, 12

*Dep't of Parks and Recreation for State of Cal. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118 (9th Cir. 2006) ....................10

*Evergreen Safety Council v. RSA Network, Inc.*, 697 F.3d 1221 (9th Cir. 2012) ....................15, 16

*Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059 (9th Cir. 2015) ....................15, 16

*FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509 (9th Cir. 2010) ....................13, 14

*Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239 (9th Cir. 2013) ....................18

*Lindy Pen Co. v. BIC Pen Corp.*, 982 F. 2d 1400 (9th Cir. 1993) (superseded by statute on other grounds *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.* 839 F.3d 1179, 1180 (9th Cir. 2016) (per curiam)) ....................14, 17

*Miller v. Glenn Miller Prods.*, 318 F. Supp. 2d 923 (C.D. Cal. 2004) ....................13, 14

*Pogrebnoy v. Russian Newspaper Distribution, Inc.*, 209 F. Supp. 1061 (C.D. Cal. 2017) ....................11, 12

*Pom Wonderful LLC v. Hubbard*,
775 F.3d 1118 (9th Cir. 2014) ........................................................ 18

*Ricci v. DeStefano*,
557 U.S. 557 (2009) ........................................................ 10

*Stone Creek, Inc. v. Omnia Italian Design, Inc.*,
875 F.3d 42643 (9th Cir. 2017) ........................................................ 15

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
610 F.3d 1171 (9th Cir. 2010) ........................................................ 18

*Trace Minerals Research, L.C. v. Mineral Resources Intern., Inc.*,
505 F. Supp. 2d 1233 (D. Utah 2007) ........................................................ 12

*Volkswagenwerk Aktiengesellschaft v. Church*,
411 F.2d 350 (9th Cir. 1969) ........................................................ 18

*Winter v. Natural Resources Defense Council*,
555 U.S. 7 (2008) ........................................................ 18

**Statutes**

15 U.S.C. § 1114 ........................................................ 10

15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A) ........................................................ 10

15 U.S.C. § 1117(a) ........................................................ 14, 15

Cal. Civil Code § 1621 ........................................................ 10

Fed. R. Civ. P. 56(a) ........................................................ 5, 9, 10

Defendant Certis Oncology Solutions, Inc., a Delaware corporation sued herein as PDOX, Inc., dba Certis Oncology Solutions (herein "Certis"), submits the following Memorandum of Points and Authorities in Support of its Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(a).

## I. INTRODUCTION

Plaintiff AntiCancer, Inc. ("AntiCancer") filed its original Complaint in this case alleging trademark infringement of the term "PDOX" against Defendant PDOX, Inc. dba Certis Oncology Solutions ("Certis") and alleging state law claims of conversion, fraud, breach of contract, unjust enrichment, and quantum meruit against Certis and Defendant Peter Ellman ("Ellman"). [Dkt. # 1]. Upon Defendants' motion, the Court dismissed the Complaint, finding that, on the face of the Complaint, Certis had an implied license to use the PDOX name and trademark. [Dkt. # 31 at 1]. In response, AntiCancer thereafter attempted to stay in federal court by filing its First Amended Complaint ("FAC") on November 4, 2018 alleging two new purported trademark violations and the same state law claims. [FAC, Dkt. # 16]. Several months after AntiCancer also later filed a motion for reconsideration of the dismissal of its first alleged trademark claim. [Dkt. # 28]. The Court denied AntiCancer's motion for reconsideration. [Dkt. # 31].

In addition, the Court previously declined to exercise supplemental jurisdiction over AntiCancer's alleged state law claims, effectively dismissing Defendant Peter Ellman. [Dkt. # 21]. Those state law claims are now the subject of a lawsuit filed by AntiCancer in San Diego Superior Court, Case No. 37-2019-00011336. Remaining in this action are only two alleged trademark infringement claims by AntiCancer against Certis. Both claims lack merit as a matter of law, both on substantive grounds and because AntiCancer has no damages and cannot show any basis for injunctive relief.

The two remaining claims regard the use of the trademarked phrases "HDRA"

and "AngioMouse," (the "Trademarks") both registered trademarks belonging to AntiCancer. While these Trademarks did at one point appear on Certis' website, Certis is entitled to summary judgment on both of these trademark claims because (i) any reasonable juror would find that Certis previously had the phrases "HDRA" and "AngioMouse" on its website with AntiCancer's permission; (ii) AntiCancer gave Certis a "naked license" with no provision maintaining AntiCancer's control over the Trademarks, and thus is estopped from asserting infringement; (iii) even if Certis improperly used the Trademarks, any reasonable juror would have to find that AntiCancer is not entitled to compensation for Certis's use because Certis has never received one dollar of revenue directly or indirectly from those Trademarks; and (iv) injunctive relief is inappropriate because Certis has always acted in good faith and has discontinued any reference to the two trademarked phrases.

## II. STATEMENT OF FACTS

In January of 2016, PDOX LLC was formed with the involvement of AntiCancer and its CEO, Dr. Robert Hoffman ("Dr. Hoffman"). Defendant PDOX, Inc. (now Certis) was later formed with Ellman as its CEO. AntiCancer received 40% of the PDOX shares, which were anticipated to be subject to later dilution as the enterprise was further funded by investors. Effective January 24, 2017, Plaintiff and Defendant Certis entered a Licensing Agreement and a Services Agreement. In the Services Agreement, AntiCancer agreed that it would use the Patient Derived Orthotopic Xenograft ("PDOX") method to perform testing and create a tumor bank of patients' tumors owned by Certis. [Dkt. # 10-3 at 31] AntiCancer also agreed that all "Deliverables," including "all materials, data, work product, results, reports and any other information generated or derived by AntiCancer in connection with [its] performance" "shall be deemed 'works for hire' and shall be the sole and exclusive property" of Certis. [Dkt. # 10-3 at 27, §§ 6.1, 6.2].

On March 13, 2018, Certis sent AntiCancer a letter notifying it that Certis was terminating the Licensing Agreement and the Services Agreement based on

AntiCancer's material breaches of those contracts. [Exhibit 1 to the Declaration of Michael L. Kirby ("Kirby Decl.") filed herewith]. As stated in that letter, Anticancer "breached the Agreement by failing to provide the Services 'in accordance with the applicable laws' and by failing to maintain the Premises in a 'reasonably professional' manner" as required by the contract. In addition, AntiCancer violated the Agreement by denying Certis access to Deliverables and failing to inform Certis of its inability to pay its material obligations.

At the time Certis terminated the agreements, AntiCancer's laboratory had numerous safety hazards and OSHA violations, and AntiCancer was unable to pay basic expenses such as rent and payroll. Indeed, Certis had advanced funds to AntiCancer several times before terminating the agreements. Although the Licensing Agreement and the Services Agreement have terminated, AntiCancer still remains Certis's largest single shareholder. [Ellman Decl., ¶2].

In approximately June 2016, Certis hired a marketing and communications strategist Evan Birkhead ("Birkhead") to, among other things, create promotional materials, including a website, as he has testified in his deposition. [Exhibit 2 to Kirby Decl. at 12:11–24], which he created using the WordPress content management system. Birkhead billed Certis monthly, working about 32 hours per month. [*Id.,* Exhibit 2, at 41:25–42:6]. While operating under its agreements with /AntiCancer, Certis's website featured the use of the terms "AngioMouse" and "HDRA", both of which are trademarks registered to AntiCancer. Dr. Hoffman, CEO of AntiCancer, personally approved the use of those Trademarks on Certis's website. [Exhibit 3 to Kirby Decl. at 88:15–19]. Importantly, Certis never had any inquiries or sales related to the AngioMouse or HDRA products. [Declaration of Peter Ellman ("Ellman Decl."), ¶ 3, filed herewith].

On March 27, 2018, Certis migrated its website from AntiCancerPDOX.com to CertisOncology.com. [Ellman Decl., ¶ 5]. On or about that date, Ellman, as CEO of Certis, directed Birkhead to remove all references to "AngioMouse" and

"HDRA" from the Certis website and promotional materials. [Exhibit 2 to Kirby Decl. at 38:24–39:6; Ellman Decl., ¶ 6]. Those two Trademarks and names were removed because Certis did not have the capability to perform the AngioMouse or HDRA procedures, and Certis had never received any inquiries about those procedures while the names were on Certis's (then PDOX's) website. [Ellman Decl., ¶ 3]. Additionally, AngioMouse and HDRA were confusing acronyms that referred to lab-based products, while Certis wanted to build a product for consumers. [Exhibit 2 to Kirby Decl. at 37:9–38:23]. Birkhead, Ellman, and Certis reasonably believed that the trademarked terms had been removed from the website. [Declaration of Evan Birkhead ("Birkhead Decl.") at ¶ 4; Ellman Decl., ¶ 9].

When Certis received AntiCancer's FAC, Ellman directed Birkhead to investigate whether certisoncology.com still contained the two Trademarks regarding AngioMouse and HDRA. [Ellman Decl., ¶ 10]. Birkhead discovered that while using WordPress to update the website, he had inadvertently left "ghost pages," one of which still contained "HDRA" and another of which still contained "AngioMouse." [Birkhead Decl., ¶ 6]. "Ghost pages" are webpages that cannot be navigated to using the internal navigation of a website, but may still be accessed through a search engine. [Birkhead Decl., ¶ 7].

What this means is that a user accessing certisoncology.com would not be able to find "HDRA" or "AngioMouse" by clicking links on the website. [Birkhead Decl., ¶ 7]. However, if a user were to google "Certis HDRA" or a similar search featuring the trademarked term, google would find the "ghost page," and the user would see a page on certisoncology.com which had previously used the trademarked term for which the user had searched. Only by specifically searching for "Certis" and "HDRA" or "AngioMouse" would a user have been able to find the "ghost pages." [Birkhead Decl., ¶ 8]. When Birkhead realized the existence of the ghost pages, he immediately deleted them. [Birkhead Decl., ¶ 9]. A week after receiving the FAC, Ellman personally checked certisoncology.com and performed google

searches for "Certis HDRA" and "Certis AngioMouse," and found that the website no longer had any mention of "HDRA" or "AngioMouse." [Ellman Decl., ¶ 13].

In addition to filing its FAC, AntiCancer sent Certis a letter dated May 22, 2019 months later, which asserts that on or before March 4, 2018, AntiCancer revoked any and all implied licenses to any of AntiCancer's intellectual property, including trademarks, and purports to reassert that revocation. [Exhibit 4 to Kirby Decl.]. The allegation of a previous revocation by AntiCancer is false. As Dr. Hoffman has testified in his deposition, there was no written termination of any agreement between Anticancer and Certis on or before March 4, 2018. [Exhibit 3 to Kirby Decl. at 95:10–14].

When pressed in his deposition to explain what was referenced by the letter as occurring on March 4, 2018, Dr. Hoffman could only identify that it was the date that Certis removed its own property from the separate space Certis had subleased from AntiCancer in AntiCancer's laboratory, an event falsely claimed by Dr. Hoffman as a "theft." [*Id.* at 94:24–95:3, 95:19–21]. Dr. Hoffman stated that he believed that his "understanding was that that theft left [Certis] with no rights." [*Id.* at 95:1–3]. This event had nothing to do with the Trademarks and not constitute a such revocation regarding AngioMouse or HDRA. Certis received no notice of revocation, written or otherwise, until the FAC. AntiCancer has identified no event, other than its FAC and the May 22, 2019 letter, that could have constituted a purported revocation of Certis's implied license to use the Trademarks "AngioMouse" and "HDRA."

## III. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could

not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citation omitted). Rule 56 "mandates the entry of summary judgment . . . against party who fails to make a showing sufficient to establish the existence of an essential element to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

AntiCancer sues under 15 U.S.C. § 1114 for alleged trademark infringement and under § 1125 for alleged unfair competition. Both provisions require a showing that the plaintiff has a protectable mark, and that the defendant used that mark in a manner that caused a likelihood of consumer confusion. While § 1114 protects only registered marks, § 1125 protects unregistered marks and trade dress as well as registered marks. *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 n. 8 (9th Cir. 1999). Here, both marks are protected so the analysis is identical. *See id.* "Infringement" will refer to both claims under § 1114 and § 1125.

## IV. <u>ARGUMENT</u>

### A. <u>Certis Had an Implied License to Use AntiCancer's Trademarks</u>

In order to show trademark infringement, a plaintiff must show that a defendant used a mark in commerce in a manner that "is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A). There is no trademark infringement where a defendant has an implied license to use a trademark. *Dep't of Parks and Recreation for State of Cal. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1129 (9th Cir. 2006). "Licenses are contracts governed by ordinary principles of state law." *Id.* at 1130. Under California law, "[a]n implied contract is one, the existence and terms of which are manifested by conduct." Cal. Civil Code § 1621.

In *De Forest Radio Telephone Co. v. United States*, 273 U.S. 236, 239 (1927). the plaintiff sued the United States government for patent infringement, alleging the United States had exceeded the scope of the pleaded license by licensing third parties to build technology on which plaintiff's patents read. Plaintiff further

alleged that, when the United States informed plaintiff of its intent to grant these third-party licenses, plaintiff informed the United States that "it would not do anything to interfere with the immediate manufacture" of the technology, but was "waiv[ing] none of its claims." Thereafter, plaintiff assisted the United States in expediting the manufacture of the technology and gave the United States access to information needed to complete the same. *Id.* at 241.

In agreeing that the lower courts had properly dismissed plaintiff's complaint for infringement, the Supreme Court recognized that plaintiff's conduct was "clearly a consent to [the] manufacture and use" of plaintiff's technology, such that plaintiff had impliedly granted a license to the United States, despite plaintiff's purported reservation of rights. *Id.* Once that license was granted, "the relation between the parties … [was] contractual and not based on an unlawful invasion of the rights of the owner" of the patent, and the license was "a complete defense against a suit for infringement." *Id.* at 241-42.

Similarly, in *Pogrebnoy v. Russian Newspaper Distribution, Inc.*, 209 F. Supp. 1061, 1066 (C.D. Cal. 2017), the parties formed an oral contract in which (1) defendant agreed to publish a Russian language newspaper in Los Angeles bearing plaintiff's mark, (2) plaintiff agreed to supply defendant with the files used for plaintiff's New York version of the same paper to facilitate the defendant's publication, and (3) the parties agreed to split the profits from defendant's distribution of the Los Angeles paper. 289 F. Supp. 3d at 1061, 1066.

Despite the fact that the parties did not "discuss [] a license for any intellectual property rights," the court nonetheless found that plaintiff had granted defendant "an implied license to use the trademark [] at issue in this litigation." *Id.* at 1068. "The course of conduct between the parties, including [plaintiff's] sending of … files, which included the trademarks, and [defendant's] incorporation of those materials into the versions of the newspapers they published, [was] sufficient … to establish the existence of an implied license" allowing defendant to use the at-issue

mark. *Id.*

As both *De Forest* and *Pogrebnoy* make clear, a plaintiff cannot actively participate in the commercialization of its intellectual property, allow a party to believe its use of the intellectual property is authorized, and then sue for infringement, claiming misuse of the same intellectual property. AntiCancer CEO Robert Hoffman thoroughly reviewed and extensively edited both Certis's promotional materials and the Certis website, in which he personally approved the use of the phrases "HDRA" and "AngioMouse". [Exhibit 3 to Kirby Decl. at 88:15–18]. Indeed, Dr. Hoffman has admitted that Certis had permission to use the two Trademarks. [*Id.* at 88:15–18]. Although there was no express agreement dictating the terms of the license, Certis's use of the Trademarks was obviously done with AntiCancer's permission, which is consisted with the Court's prior ruling that Certis had a license to use PDOX.

**B. <u>Certis's License to Use AntiCancer's Trademarks Was Not Revoked Until AntiCancer Filed its First Amended Complaint</u>**

Certis's implied license was never revoked, notwithstanding AntiCancer's claims to the contrary. "Trademark license contract disputes are governed by the general rules of contract interpretation. A license containing no time frame is generally terminable at will." *Trace Minerals Research, L.C. v. Mineral Resources Intern., Inc.*, 505 F. Supp. 2d 1233, 1241 (D. Utah 2007). Such a termination requires reasonable notice. *See Consolidated Theatres, Inc. v. Theatrical Stage Emp. Union, Local 16*, 69 Cal. 2d 713, 727–28 (1968).

In a letter dated May 22, 2019, AntiCancer argued that any implied license for any of AntiCancer's intellectual property was revoked on or before March 4, 2018. [Exhibit 4 to Kirby Decl.]. In addition, the letter specifically states AntiCancer's position that it revoked permission for Certis to use the PDOX trademark, a position that was directly contradicted by this Court's prior rulings regarding "PDOX." [Dkt. # 31, 15].

AntiCancer is as wrong about "AngioMouse" and "HDRA" as it was about "PDOX." The first notice that Certis had that AntiCancer no longer wished to permit Certis to use the Trademarks was the filing of its FAC. AntiCancer cannot point to any earlier event that constitutes a revocation of Certis's implied license. Immediately after receiving the FAC, Peter Ellman, the CEO of Certis, discovered that Birkhead, the independent contractor responsible for its website, had inadvertently left "ghost pages" containing the trademarks on its website. [Ellman Decl. ¶¶ 10–11; Birkhead Decl. ¶¶ 5–6]. Certis immediately removed the "ghost pages" from its website and Ellman personally confirmed that they were gone one week after Certis's receipt of the FAC. [Ellman Decl., ¶ 13]. Because there is no evidence that AntiCancer previously terminated Certis's implied license, Certis is entitled to summary judgment on the issue of infringement. *See Celotex*, 477 U.S. 317, 321–22 (A movant is entitled to summary judgment against a party who fails to introduce evidence "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

**C. <u>AntiCancer Failed to Maintain Control Over its Trademarks, and is Therefore Estopped from Asserting Infringement</u>**

AntiCancer is estopped under the naked licensing doctrine from suing Certis for infringement. "[T]rademark owners have a duty to control the quality of their trademarks." *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 515 (9th Cir. 2010). "'Naked licensing' occurs when the licensor fails to exercise adequate quality control over the licensee." *Id.* Under the doctrine, a trademark owner's "'[f]ailure to exercise such control and supervision … may estop the trademark owner from challenging the use of the mark and business which the licensee has developed during the period of such unsupervised use.'" *Miller v. Glenn Miller Prods.*, 318 F. Supp. 2d 923, 945 & n.12 (C.D. Cal. 2004) ("the defense of estoppel is an off-shoot of the defense of abandonment or naked licensing") (quoting *Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 123–24 (5th Cir. 1973).

Where a plaintiff has knowledge of the use of its trademark by another but fails to object to that licensee's business activities, plaintiff fails to comply with its duty to "affirmatively supervise or control … [its] trademark rights," and is estopped from enforcing those trademark rights. See *Miller*, 318 F. Supp. 2d at 945–46 (defendant was estopped under the naked licensing doctrine where plaintiff "never objected to any of [defendant's] business activities … or in any way communicated with [defendant] regarding any qualitative aspect of [defendant's] operations"); *Freecycle*, *supra,* 626 F.3d at 516–19 (affirming summary judgment for defendant that plaintiff had engaged in naked licensing where there was no express license agreement and plaintiff failed to exercise control of the quality of services defendant provided).

AntiCancer has admitted that it approved Certis's use of the two Trademarks. [Exhibit 3 to Kirby Decl. at 88:15–18]. Moreover, the Services Agreement is devoid of any attempt or intent by AntiCancer to control Certis's use of the Trademarks, and the FAC does not suggest otherwise. [*See generally* FAC, Dkt. # 16; Services Agreement, Dkt. # 10-3 at 25–33]. Accordingly, Plaintiff cannot now belatedly assert it has satisfied its "duty to control the quality" of Certis' use of the Trademarks, and is thus estopped under the naked license doctrine from asserting a claim for infringement against Certis.

**D. Even if Certis Improperly Used AntiCancer's Trademarks, AntiCancer's Claims Fail Because It Cannot Show Any Actual Damages**

Even if a reasonable juror could find that Certis might have inadvertently infringed AntiCancer's trademark, AntiCancer cannot show that it is entitled to any compensation as a result. When a trademark violation has been established, a plaintiff is generally entitled "to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action," subject to the principles of equity. 15 U.S.C. § 1117(a). In a trademark case, a plaintiff must establish damages with reasonable certainty. *Lindy Pen Co. v. BIC Pen Corp.,* 982 F. 2d

1400 (9th Cir. 1993) (superseded by statute on other grounds *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.* 839 F.3d 1179, 1180 (9th Cir. 2016) (per curiam)).

**1. Defendant Has No Revenue or Profits**

AntiCancer cannot recover profits from Certis because any alleged infringing use of the Trademarks, if it occurred, was not willful, and in any case Certis earned no profits from it. Indeed, Certis earned no revenue at all from either trademark. In order to recover a defendant's profits, the Ninth Circuit requires a showing of willful trademark infringement. *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 439–43 (9th Cir. 2017). "Willful infringement carries a connotation of deliberate intent to deceive. Generally, deliberate, false, misleading, or fraudulent conduct meets this standard. Willfulness requires a connection between a defendant's awareness of its competitors and its actions at those competitors' expense." *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1074 (9th Cir. 2015) (Internal quotations and citations omitted). Infringement is not willful if the infringing party has a reasonable belief that its use is not an infringing one. *Evergreen Safety Council v. RSA Network, Inc.*, 697 F.3d 1221, 1228 (9th Cir. 2012). When assessing the amount of profits, the plaintiff bears the burden of proving the defendant's sales. 15 U.S.C. § 1117(a). The undisputed evidence shows that Certis had no sales, and no revenue from the two Trademarks.

In *Hope Road Music, supra,* defendant A.V.E.L.A., Inc. licensed the use of several images of Bob Marley to defendant corporations Jem and Freeze for the production of t-shirts and other merchandise featuring the images. 778 F.3d at 1066. Hope Road successfully sued for trademark infringement for the use of his likeness. *Id.* at 1066–67. The evidence was sufficient to support a finding of willfulness against Freeze when it knew that A.V.E.L.A. did not have the right to use Bob Marley's name and likeness, it knew that Hope Road and the Marley Family held the only rights to Marley's name and likeness, and it knew that Hope Road had licensed Zion, a competitor of Freeze, to sell Bob Marley merchandise. *Id.* at 1074.

In contrast, in *Evergreen Safety Council*, *supra,* defendant Evergreen Safety Council had produced a training manual for pilots in consultation with plaintiff RSA Networks. 697 F.3d at 1224–25. RSA then alleged that Evergreen had infringed its copyright on a similar training manual. *Id.* Evergreen was properly granted summary judgment on the issue of willfulness when it had sent the president of RSA networks a copy of the manual for review, paid him $300 for his consultations, and thanked him for his contributions to the foreword of the manual, and RSA had advertised its involvement in developing a training program with Evergreen and the state of Washington. *Id.* at 1128. Those facts supported a finding that Evergreen had a reasonable belief that its use was not infringing because it had an implied license. *Id.* at 1129.

If Certis infringed AntiCancer's Trademarks, it did not act willfully because (i) Certis had a reasonable belief that it still had a right to use the Trademarks, even though it was not intentionally doing so, and (ii) Certis had a reasonable, if temporarily incorrect, belief that the Trademarks did not appear on its website. *See Id.* at 1228 (infringement is not willful if a party has a reasonable belief that its use is not infringing). Certis used the Trademarks based on the personal approval of the CEO of Anticancer, on which Certis reasonably relied in its belief that it had permission to use the Trademarks. [Exhibit 3 to Kirby Decl. at 88:15–19].

Certis had no notice and was unaware of any revocation of its right to use the Trademarks before AntiCancer filed its FAC. [Ellman Decl. ¶ 14]. Additionally, Certis removed all references to the Trademarks from its website on or about March 27, 2018, except for lingering references on "ghost pages" that were inaccessible via site navigation. [Ellman Decl., ¶¶ 6, 9–11]. Certis was reasonably unaware that its website still had nearly unreachable pages that contained the Trademarks.

In addition, Certis had no intention to capitalize on a trademark at a competitor's expense. *See Hope Road Music*, 778 F.3d at 1074 ("Willfulness requires a connection between a defendant's awareness of its competitors and its

actions at those competitors' expense."). To the contrary, Certis lacked the capability to even perform AngioMouse or HDRA procedures, and could have only offered those procedures by asking AntiCancer to perform them. [Ellman Decl., ¶ 6]. If there had been any revenue from Certis's use of the Trademarks, it would have been to AntiCancer's benefit. But there was no such revenue at all.

Not only was Certis's alleged infringement of the Trademarks not willful, it also generated no revenue or profits for Certis. As noted, Certis is a pre-revenue startup company and in 2018 had revenue of only $15,000 (compared with operating expenses of over $1 million). [Ellman Decl., ¶ 8]. That minuscule revenue is completely unrelated to the use of the HDRA and AngioMouse trademarks. [Ellman Decl., ¶ 8]. As previously stated, Certis lacked the capability to perform HDRA or AngioMouse procedures, and could only have offered those procedures through AntiCancer. Dr. Hoffman acknowledged in his deposition that he was unaware of any instance where Certis used the AngioMouse or HDRA processes, nor was he aware of Certis even having the capability to do so. [Exhibit 3 to Kirby Decl. at 74:22–75:1, 77:13–24]. AntiCancer can prove neither of the essential elements of its claim for sales, profits or actual damages.

**2. Plaintiff Suffered No Actual Damages**

To recover actual damages for trademark infringement, "[a] plaintiff must prove both the fact and the amount of damage." *Lindy Pen Co., supra,* 982 F. 2d at 1407. To date, AntiCancer has provided no evidence showing that they were actually damaged in any manner by Certis's use of its Trademarks. There is no evidence in the record of any actual consumer confusion, loss of sales, or any other kind of actual damages from Certis's alleged infringement. In the absence of any evidence to make that finding, no reasonable juror could find that AntiCancer was damaged at all. *See Celotex*, 477 U.S. 317, 321–22 (A movant is entitled to summary judgment against a party who fails to introduce evidence "sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial.").

**E. Injunctive Relief is Inappropriate Because Certis Has Always Acted in Good Faith and Has Discontinued Use of AntiCancer's Trademarks**

Anticancer's requests for preliminary and permanent injunctions in the FAC are meritless and granting them would be unfair to Certis. In order to be granted a preliminary injunction which AntiCancer has not requested, a plaintiff must show (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities favor an injunction, and (4) that an injunction is in the public interest. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008). The analysis for a permanent injunction is essentially the same, except that the plaintiff must show actual success on the merits rather than a likelihood of success. *Id.* at 32. The issuing of an injunction "is a matter of equitable discretion." *Id.* Recognizing there is no evidence of the need or basis for any form of a preliminary injunction, AntiCancer has sought no injunctive relief in the 15 plus months this case has been on file.

An injunction may be unnecessary and improper where infringement has ceased. *See Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1182 (9th Cir. 2010); *Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350, 352 (9th Cir. 1969). In addition, "a preliminary injunction in a trademark infringement case must establish a likelihood of irreparable harm that is grounded in evidence, not in conclusory or speculative allegations of harm." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1133 (9th Cir. 2014) (summarizing *Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249, 1250–51 (9th Cir. 2013)).

Here, AntiCancer cannot succeed on the merits. For the reasons outlined in section IV. A. of this motion, a jury would have to find that Certis never infringed AntiCancer's Trademarks because it had an implied license to do so, and ceased use of that mark before its license was terminated. In addition, AntiCancer's allegations of irreparable harm have not been substantiated by any evidence, nor has

AntiCancer specified what exactly the future harm might be. Its allegation of irreparable harm is therefore conclusory and speculative, making it insufficiently concrete to ever support the issuance of any form of injunction.

The balance of equities disfavor an injunction: although Certis has no intent of using AntiCancer's Trademarks and would not be harmed by a requirement not to use them, an injunction could needlessly harm Certis's reputation and business plans. Certis is a small startup company, and an injunction against it could cause unwarranted damage to Certis. In contrast, AntiCancer has suffered no actual harm and will not suffer any future harm because Certis has no intention of ever using AntiCancer's marks in the future. Finally, the public interest does not favor an injunction because it would accomplish nothing and would therefore be a waste of judicial resources. In light of Certis's good faith and well documented cessation of use of AntiCancer's marks, the issuance of an injunction against Certis would, as a matter of law, be inequitable and inappropriate.

## V. CONCLUSION

For the foregoing reasons, Defendant Certis respectfully asks the Court to issue an order granting summary judgment in favor of Defendant on Plaintiff's first and second claims for relief of the First Amended Complaint, which will terminate this entire action.

Dated: October 21, 2019

KIRBY & KIRBY LLP

By: /s/ Michael L. Kirby
Michael L. Kirby
Attorney for Defendants