Michael L. Kirby, Esq. (SBN 50895)
  mike@kirbyandkirbylaw.com
**KIRBY & KIRBY LLP**
501 West Broadway, Suite 1720
San Diego, California 92101
Telephone: 619.487.1500
Facsimile: 619.501.5733

**Attorney for Defendants**

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTICANCER, INC., | Case No.: 18-cv-1543-CAB-MDD |
| Plaintiff, | **DECLARATION OF MICHAEL L. KIRBY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| PDOX, INC., dba CERTIS ONCOLOGY SOLUTIONS, PETER ELLMAN, and DOES 1 to 10, | **Hearing Date: November 25, 2019** |
| Defendants. | PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT |
| | Judge:       Hon. Cathy Ann Bencivengo |
| | Dept.:        4C |
| | Magistrate: Mitchell D. Dembin |
| | Dept.:        11th Floor |

Michael L. Kirby, under penalty of perjury, declares as follows:

1.      I am an attorney duly admitted to practice law before all the Courts in the State of California. I am a partner at the firm of Kirby & Kirby LLP and am counsel for Defendants Certis Oncology Solutions, Inc. ("Certis") and Peter Ellman. I submit this Declaration in Support of Certis' Motion for Summary Judgment.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of Letter from Eric J. Eastham, Esq. at the law firm of Mintz Levin, to Dr. Robert Hoffman dated March 13, 2018 re Notice of Termination of License Agreement and Services Agreement.

1

1       3.     Attached hereto as **Exhibit 2** is a true and correct copy of Excerpts

2   from the Deposition of Evan Birkhead, taken in the matter entitled *AntiCancer, Inc.*

3   *v. Certis Oncology Solutions, Inc., et al.*, San Diego Superior Court, Case No. 37-

4   2019-00011336, on August 13, 2019.

5       4.     Attached hereto as **Exhibit 3** is a true and correct copy of Excerpts

6   from the Deposition of Dr. Robert Hoffman, taken in this matter on August 14,

7   2019.

8       5.     Attached hereto as **Exhibit 4** is a true and correct copy of Letter from

9   Dr. Robert Hoffman to Peter Ellman dated May 22, 2019.

10       I declare under penalty of perjury under the laws of the United States and

11   California that the foregoing is true and correct, and that this Declaration was

12   executed this 21st day of October, 2019, at San Diego, California.

13

14

15   MICHAEL L. KIRBY

16

17

18

19

20

21

22

23

24

25

26

27

28

{K&K0215065
7}

*AntiCancer, Inc. v. PDOX, Inc. and Peter Ellman*
USDC, Southern District of California, Case No. 18-cv-1543-CAB-MDD

## EXHIBITS TO THE DECLARATION
## OF MICHAEL L. KIRBY

| Exhibit No. | Description | Page No. |
|:---:|---|:---:|
| 1 | Letter from Eric J. Eastham, Esq., Mintz Levin, to Dr. Robert Hoffman dated March 13, 2018 re Notice of Termination of License Agreement and Services Agreement | 001 - 004 |
| 2 | Excerpts from the Deposition of Evan Birkhead, taken in the matter entitled *AntiCancer, Inc. v. Certis Oncology Solutions, Inc., et al.*, San Diego Superior Court, Case No. 37-2019-00011336, on August 13, 2019 | 005 - 012 |
| 3 | Excerpts from the Deposition of Dr. Robert Hoffman, taken in the matter entitled *AntiCancer, Inc. v. Certis Oncology Solutions, Inc., et al.*, United States District Court, Southern District of California, Case No. 18-cv-1543-CAB-MDD | 013 - 020 |
| 4 | Letter from Dr. Robert Hoffman to Peter Ellman dated May 22, 2019 | 021 - 023 |

# EXHIBIT 1

**EXHIBIT 1**
0001

# MINTZ LEVIN

Eric J. Eastham | 858 314 1877 | ejeastham@mintz.com

3580 Carmel Mountain Road, Suite 300
San Diego, CA 92130
858-314-1500
858-314-1501 fax
www.mintz.com

March 13, 2018

VIA ELECTRONIC AND U.S. MAIL

Robert Hoffman (meishale@gmail.com)
AntiCancer, Inc.
7917 Ostrow Street
San Diego, CA 92111



Re:   Notice of Termination of License Agreement and Services Agreement

Dear Mr. Hoffman:

Our firm represents PDOX, Inc.  As explained further below, please be advised that PDOX
hereby provides notice of its termination of the two agreements between PDOX and AntiCancer,
Inc. – the Services Agreement and the Exclusive License Agreement.

## The Services Agreement

As you are aware, PDOX and AntiCancer are parties to the January 24, 2017 Services
Agreement.  PDOX has elected to terminate the Services Agreement for cause pursuant to
Section 9 as a result of AntiCancer's multiple, material breaches of the Agreement.

AntiCancer's material breaches of the Agreement include, but are not limited to, the following:

- Sections 1, 2 & 3: The Agreement requires AntiCancer to provide the Services to
PDOX "in a timely and professional manner and in accordance with all applicable
laws."  The Agreement further requires AntiCancer to allocate a portion of its facility
to PDOX for use as a laboratory and to maintain the remainder of the Premises such
that it "present[s] a reasonably professional image to visitors including patients,
caregivers, PDOX employees, consultants and investors."  As you know, and as the
Agreement contemplates, PDOX intends to obtain a CLIA[1/] Certification, which is
vital to its business.  AntiCancer has breached the Agreement by failing to provide the
Services "in accordance with applicable laws" and by failing to maintain the Premises
in a "reasonably professional" manner.  Specifically, PDOX is informed by its health
and safety experts that AntiCancer is in violation of numerous laboratory health and
safety standards that will preclude PDOX from obtaining its CLIA Certification.

  These standards include, but are not limited to, Section 5(a)(1) of OSHA, referred to as
the "General Duty Clause," which requires AntiCancer to furnish a place of
employment "free from recognized hazards that are causing or are likely to cause death
or serious physical harm to his employees" and to "comply with occupational safety
and health standards" promulgated by OSHA.  AntiCancer is also in violation of

---

[1/]   Clinical Laboratory Improvement Amendments of 1988 ("CLIA").

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

BOSTON | LONDON | LOS ANGELES | NEW YORK | SAN DIEGO | SAN FRANCISCO | STAMFORD | WASHINGTON

**EXHIBIT 1**

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

Robert Hoffman
March 13, 2018
Page 2

OSHA 29 CFR 1910.1000 *et seq.*, regulating exposure to airborne chemicals, OSHA 29 CFR 1910.1030, *et seq.*, concerning exposure to bloodborne pathogens, and OSHA 29 CFR 1910.1450 *et seq.*, regulating exposure to hazardous chemicals in laboratories. For example, PDOX notes that AntiCancer has failed to keep the vivarium, common areas, and other portions of the Premises in an acceptable, hazard-free condition. PDOX is aware that AntiCancer keeps laboratory mice living outside of a barrier vivarium; surgeries using hazardous drugs are performed at the Premises without proper hood ventilation and the employees conducting such surgeries are not properly trained or supervised; genetically modified bacteria are being grown by AntiCancer in rooms that do not have proper air containment standards and therefore visitors and employees are being exposed to noxious odors; and hazardous materials and biomedical waste are not being properly stored or removed. This list is not exhaustive.

- Section 6: The Agreement also specifies that all Deliverables (as that term is defined in the Agreement) "shall be the sole and exclusive property of" PDOX. However, Anticancer has wrongfully denied PDOX access to such Deliverables, including documentation needed to acquire its CLIA Certification. AntiCancer's refusal to provide PDOX with any and all Deliverables constitutes another material breach of the Agreement.

- Section 11: The Agreement further requires AntiCancer to notify PDOX in the event it is unable to pay a Material Obligation, which is defined as any obligation that, if unpaid, is reasonably likely to jeopardize AntiCancer's ability to perform the Services or Company's ability to get the full use and enjoyment of the PDOX Space. Such Material Obligations expressly include items such as rent, utilities, payments to employees and other creditors. PDOX is informed that AntiCancer is in arrears with respect to, among others, the rent for the Premises and the payroll for AntiCancer's employees. Indeed, PDOX has advanced tens of thousands of dollars to AntiCancer so that the company can temporarily satisfy certain past-due debts, including its rent obligations which PDOX is informed have been in arrears for a number of years, and it now fears that AntiCancer is insolvent. AntiCancer has failed to formally notify PDOX of these and any other unpaid obligations, as required by the Agreement.

## The Exclusive License Agreement

AntiCancer has also breached the Exclusive License Agreement by which AntiCancer purported to license twelve patents to PDOX. Since executing the Agreement, PDOX was surprised to learn that eleven of the twelve patents had expired or were otherwise invalid prior to the Effective Date of the License Agreement, January 24, 2017. These facts were never disclosed to PDOX during the discussions preceding this agreement, yet were known or should have been known to AntiCancer. To make matters worse, in the License Agreement, Section 6.1(f), AntiCancer represented, among others, that as of the Effective date it "owns or otherwise has the right to license" the twelve patents to PDOX. It is now clear to PDOX that AntiCancer's representations were false when made. As a result of AntiCancer's misrepresentations in connection with the License Agreement, PDOX has elected to terminate the agreement pursuant

EXHIBIT 1
0003

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

Robert Hoffman
March 13, 2018
Page 3

to section 10.4 for AntiCancer's breach of the agreement and its "fail[ure] to fulfill [its] material obligation[s]" as required by the License Agreement. PDOX considers the termination of the License Agreement to be effective immediately because AntiCancer's breach of Section 6 cannot be cured.

PDOX regrets to inform you of its termination of these two agreements and that its relationship with AntiCancer was not mutually beneficial to the parties. PDOX recognizes you remain a shareholder of PDOX and it remains open to a future relationship with you and/or AntiCancer should the right opportunity present itself.

Very truly yours,

Eric J. Eastham

cc:     James Cartoni (jim@agiletic.com)

76183073v.1

**EXHIBIT 1**
0004

# EXHIBIT 2

EXHIBIT 2
0005

1         SUPERIOR COURT OF THE STATE OF CALIFORNIA

2           COUNTY OF SAN DIEGO, CENTRAL DIVISION

3

4   ANTICANCER, INC.,            )

5         Plaintiff,       ) Case No.:

6         vs.             ) 37-2019-00011336-CU-BC-CTL

7   CERTIS ONCOLOGY SOLUTIONS, INC., a  )

8   Delaware corporation; and      )

9   PETER ELLMAN, an individual, and   )

10  DOES 1 to 10,             )

11        Defendants.      )

12  _____)

13

14      VIDEOTAPED DEPOSITION OF EVAN BIRKHEAD

15         San Diego, California

16          August 13, 2019

17

18

19

20

21  Reported by:

22  Lauren Ramseyer,

23  CSR No. 14004

24  Job No. 3457819

25  Pages 1 - 67

Page 1

EXHIBIT 2
0006

| | | |
|---|---|---|
| 1 | A.   Yes, several months later. | 13:21:45 |
| 2 | Q.   So you met Mr. Ellman first? | 13:21:47 |
| 3 | A.   Correct. | 13:21:50 |
| 4 | Q.   What was your first involvement, in a | 13:21:51 |
| 5 | business sense, with Mr. Ellman or Pete -- well, are | 13:21:52 |
| 6 | you aware of a company called PDOX, Inc.? | 13:21:56 |
| 7 | A.   Yes. | 13:21:59 |
| 8 | Q.   Okay. | 13:22:00 |
| 9 | A.   I was a consultant for PDOX, Inc., | 13:22:00 |
| 10 | originally. | 13:22:03 |
| 11 | Q.   And when did you start working for PDOX, | 13:22:04 |
| 12 | Inc., approximately? | 13:22:06 |
| 13 | A.   June 2016. | 13:22:07 |
| 14 | Q.   And what were you hired to do? | 13:22:10 |
| 15 | A.   I was hired -- well, the company was a | 13:22:12 |
| 16 | blank slate.  It had Dr. Hoffman's research on | 13:22:15 |
| 17 | AntiCancer, but it was going to bring all that | 13:22:21 |
| 18 | research to a new company called PDOX and just | 13:22:23 |
| 19 | promote the orthotopic PDX procedure.  So my | 13:22:27 |
| 20 | proposal to PDOX was to prepare materials with | 13:22:32 |
| 21 | messaging for patients, for cancer doctors, and for | 13:22:41 |
| 22 | clinical research organizations, and to do -- build | 13:22:47 |
| 23 | a preliminary website and preliminary materials, | 13:22:52 |
| 24 | such as sales decks.  So one of the first projects | 13:22:55 |
| 25 | we did was build an investor deck to go out to | 13:22:59 |

Page 12

EXHIBIT 2
0007

| | | |
|---|---|---|
| 1 | PDOX, and rather than patient-derived orthotopic | 13:56:13 |
| 2 | xenografts, we started to refer to it as orthotopic | 13:56:16 |
| 3 | PDX, orthotopic patient-derived xenografts, which | 13:56:21 |
| 4 | PDX is sort of the industry generic term for mouse | 13:56:26 |
| 5 | xenografts. | 13:56:30 |
| 6 | So we -- I spent a weekend where I changed | 13:56:32 |
| 7 | all of the -- all of the PDOXs to orthotopic PDX so | 13:56:35 |
| 8 | we wouldn't be using the PDOX mark anymore. | 13:56:42 |
| 9 | Q. Did you ever have any involvement with an | 13:56:47 |
| 10 | AngioMouse trademark? | 13:56:48 |
| 11 | A. Yes. | 13:56:53 |
| 12 | Q. What was your involvement? | 13:56:53 |
| 13 | A. So in the early phases, the early | 13:56:55 |
| 14 | brochures, we listed -- there were two or three | 13:56:57 |
| 15 | other trademarks that were lab procedures that I -- | 13:57:01 |
| 16 | that we would do with tumors that were part of the | 13:57:04 |
| 17 | AntiCancer sphere of product offerings. | 13:57:08 |
| 18 | Q. And was the other one AngioMouse -- no, A | 13:57:14 |
| 19 | -- AHDR, DA? | 13:57:18 |
| 20 | MR. ELLMAN: HDRA. | 13:57:20 |
| 21 | MR. KIRBY: HDRA. | 13:57:24 |
| 22 | THE WITNESS: Yes, sounds right. | 13:57:25 |
| 23 | BY MR. KIRBY: | 13:57:26 |
| 24 | Q. What was that, to your understanding? | 13:57:26 |
| 25 | A. I didn't understand what any of them were. | 13:57:28 |

Page 37

EXHIBIT 2
0008

| | | |
|---|---|---|
| 1 | They were -- from my perspective, I was trying -- I | 13:57:30 |
| 2 | was trying to market and promote the orthotopic PDX | 13:57:34 |
| 3 | technique, and any other products that we would put | 13:57:39 |
| 4 | out there would dilute that message, because that | 13:57:43 |
| 5 | message was how we were going to help -- help | 13:57:46 |
| 6 | patients and appeal -- appeal to oncologists. | 13:57:49 |
| 7 | So any of those clinical lab types of | 13:57:52 |
| 8 | products were initially listed on the -- on the PDOX | 13:57:56 |
| 9 | site, because AntiCancer would have done that work, | 13:58:01 |
| 10 | as I understood it, but once we became Certis | 13:58:05 |
| 11 | Oncology, we -- we took all that information down. | 13:58:10 |
| 12 | Q.   You didn't want either of those to dilute | 13:58:13 |
| 13 | or detract from the PDOX -- or the PDX? | 13:58:16 |
| 14 | A.   Correct, yeah.  They weren't -- they | 13:58:20 |
| 15 | weren't good -- I was looking for good acronyms, | 13:58:23 |
| 16 | good names that would appeal to people, that they | 13:58:25 |
| 17 | would understand what it is.  Those were lab | 13:58:28 |
| 18 | products, and we were -- we were trying to build | 13:58:32 |
| 19 | what would eventually become a consumer -- product | 13:58:35 |
| 20 | for consumers. | 13:58:39 |
| 21 | Q.   And neither of those were products for | 13:58:40 |
| 22 | consumers, correct? | 13:58:42 |
| 23 | A.   I don't think so. | 13:58:44 |
| 24 | Q.   And at some point, were you told to remove | 13:58:45 |
| 25 | any reference to HDRA from the web -- from the PDOX, | 13:58:47 |

Page 38

**EXHIBIT 2**
0009

| | | |
|---|---|---|
| 1 | Inc. or Certis Oncology website? | 13:58:52 |
| 2 | A. So it was right around the time we were | 13:58:54 |
| 3 | moving to Certis Oncology, we sort of made it -- the | 13:58:58 |
| 4 | Certis team made an executive decision to -- to | 13:59:02 |
| 5 | phase out all the AntiCancer related trademarks and | 13:59:05 |
| 6 | stop using them completely. | 13:59:08 |
| 7 | Q. Did you ever become aware of whether there | 13:59:11 |
| 8 | was ever any -- a dollar of revenue generated by | 13:59:13 |
| 9 | either HDRA or AngioMouse? | 13:59:16 |
| 10 | A. No. From AntiCancer, not from PDOX. | 13:59:20 |
| 11 | Q. Did anybody ever give you any indication | 13:59:29 |
| 12 | of the volume of revenue, if any, from AntiCancer | 13:59:32 |
| 13 | from those two trademarks? | 13:59:35 |
| 14 | A. No. | 13:59:36 |
| 15 | Q. But the one that you did know, there was | 13:59:37 |
| 16 | no revenue for PDOX, Inc. or Certis from those two | 13:59:39 |
| 17 | trademarks, correct? | 13:59:43 |
| 18 | A. Correct. | 13:59:53 |
| 19 | Q. Let's mark Exhibit 16. | 13:59:54 |
| 20 | (Exhibit 16 was marked for identification.) | 13:59:55 |
| 21 | BY MR. KIRBY: | 14:00:06 |
| 22 | Q. Can you tell us what Exhibit 16 is, or | 14:00:11 |
| 23 | what it depicts? | 14:00:14 |
| 24 | A. I'm not a hundred percent sure what this | 14:00:15 |
| 25 | is, but I think what it is, is we were taking | 14:00:17 |

Page 39

EXHIBIT 2
0010

```
1    point.                                              14:01:58

2         Q.   And this was Dr. Hoffman approving of the  14:02:00

3    new logo for PDOX?                                  14:02:02

4         A.   Yes.  That's Dr. Hoffman's email alias.    14:02:04

5    And this is one of several logos that -- that we    14:02:07

6    proposed using.  We didn't -- in fact, we didn't end 14:02:13

7    up using this one, but the idea was that we were    14:02:17

8    going to brand the company PDOX with the preface    14:02:20

9    AntiCancer, so the company was going to be named    14:02:24

10   AntiCancer PDOX, to harken back to people that were  14:02:26

11   familiar with the company AntiCancer.  So we        14:02:31

12   designed several logos for that.  The one we ended   14:02:33

13   up using had AntiCancer and PDOX a little more       14:02:36

14   balanced.                                           14:02:39

15        Q.   And at some point the name changed to      14:02:40

16   simply PDOX, Inc., and then later to Certis          14:02:42

17   Oncology?                                            14:02:46

18        A.   No, that's not the way I understand it.  I 14:02:47

19   understand that the parent company was always        14:02:50

20   PDOX, Inc., and we were changing the name of the dba 14:02:52

21   from AntiCancer PDOX, to Certis Oncology Solutions.  14:02:56

22        Q.   Okay.  Mark Exhibit 18.                    14:03:00

23        (Exhibit 18 was marked for identification.)     14:03:16

24   BY MR. KIRBY:                                        14:03:18

25        Q.   By the way, how did you -- did you bill     14:03:18

                                                 Page 41
```

**EXHIBIT 2**
0011

| | | |
|---|---|---|
| 1 | for your time on a monthly or quarterly basis, how | 14:03:21 |
| 2 | did you bill? | 14:03:25 |
| 3 | A.    Yeah, we were on a monthly retainer, and I | 14:03:26 |
| 4 | would bill at the end of the month, and the | 14:03:29 |
| 5 | agreement was that I would do one day a week or | 14:03:31 |
| 6 | about eight hours a day, or about 32 hours a month. | 14:03:35 |
| 7 | Q.    How detailed were your billings? | 14:03:41 |
| 8 | A.    They weren't. | 14:03:44 |
| 9 | Q.    Okay. | 14:03:45 |
| 10 | A.    I did -- it's funny, because most clients | 14:03:46 |
| 11 | I will break down by the hour, but as Pete, as the | 14:03:49 |
| 12 | person who had to approve those, didn't want to deal | 14:03:53 |
| 13 | with that. Neither did I. | 14:03:55 |
| 14 | Q.    Tell us what's Exhibit 18 deal with. | 14:03:57 |
| 15 | A.    This is a poster that was created from a | 14:04:10 |
| 16 | published article that was written by one of the | 14:04:16 |
| 17 | UCLA doctors, and we obtained permission to use the | 14:04:20 |
| 18 | poster on our website and in our marketing | 14:04:24 |
| 19 | materials. | 14:04:26 |
| 20 | Q.    Obtained permission from the doctors? | 14:04:27 |
| 21 | A.    From UCLA. | 14:04:29 |
| 22 | Q.    Okay.  Who is Tara, that's referred to in | 14:04:31 |
| 23 | here in the first email? | 14:04:45 |
| 24 | A.    She's one of the oncologists who's a | 14:04:47 |
| 25 | colleague of Dr. Singh and Dr. Eilber, and she was | 14:04:50 |

Page 42

EXHIBIT 2
0012

# EXHIBIT 3

**EXHIBIT 3**
0013

1            UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4    ANTICANCER, INC.,                    )

5            Plaintiff,                    ) Case No.:

6            v.                           ) 18-cv-1543-CAB-MDD

7    PDOX, INC., dba CERTIS ONCOLOGY      )

8    SOLUTIONS, PETER ELLMAN, and DOES 1  )

9    to 10,                               )

10           Defendants.                   )

11    _____     )

12

13      VIDEOTAPED DEPOSITION OF ROBERT HOFFMAN, Ph.D.

14            San Diego, California

15            August 14, 2019

16

17      Reported by: Lauren Ramseyer, CSR No. 14004

18

19

20

21

22

23

24

25

                                          Page 1

EXHIBIT 3
0014

1      A.    That's part of nothing, yes.  Nothing.
2  They couldn't do.
3      Q.    You knew in 2017 that PDOX, Inc. could not
4  use the AngioMouse process at all.
5      A.    I -- they could have if we would have --
6  if we would have had some agreement to do it.  Could
7  have.
8      Q.    But no one from PDOX, Inc. ever asked that
9  PDOX, Inc. be allowed to use the AngioMouse process,
10 did they?
11     A.    Not to my memory.
12     Q.    Okay.  And you're not aware of any
13 instance, are you, where PDOX ever used the
14 AngioMouse process?
15     A.    Can we keep our terms a little bit more
16 precise?  PDOX, Inc. --
17     Q.    Yes, I'm sorry.  I thought I --
18     A.    -- aka Certis, aka whatever they aka
19 about.  So we're talking about --
20     Q.    Yes, let me restate it.  I'll restate the
21 question.
22           You're not aware of any instance where
23 PDOX, Inc. ever used the AngioMouse process; is that
24 true?
25     A.    I'm not aware.  That's correct.  You're

                                          Page 74

**EXHIBIT 3**
0015

1    correct.

2        Q.   And you're not aware that PDOX, Inc. ever

3    received one dollar of revenue related to any use of

4    the AngioMouse process; is that true?

5        A.   I think you told me PDOX, Inc. didn't have

6    one dollar of revenue for anything.

7        Q.   From that, we can assume they didn't have

8    any revenue from AngioMouse, correct?

9        A.   Yes, sir.

10           MR. VALENTI:   I'm just going to object.

11   That's speculative.   It assumes facts not in

12   evidence.

13   BY MR. KIRBY:

14       Q.   There was, in all the board meetings that

15   you attended at PDOX, Inc., there was never a

16   discussion about PDOX, Inc. getting into the use of

17   AngioMouse process, was there?

18       A.   Not that I can remember.

19       Q.   All right.  You were aware, though, when

20   you were working with Mr. Birkhead -- is that his

21   name, from yesterday -- that the name AngioMouse

22   appeared on some of the brochures or on the

23   literature, correct?

24       A.   Yes.

25       Q.   And you didn't object to that, did you?

                                        Page 75

**EXHIBIT 3**
0016

1    PDOX, Inc. removed the reference to AngioMouse on

2    its website?

3        A.    I think AngioMouse was long on the website

4    that -- I testified yesterday, Mr. Kirby, that that

5    website is very complicated.   There's -- you go

6    here, there, and there, and brochures open up.   So I

7    think -- and we can go back in history and look that

8    AngioMouse stayed on that website a long time.

9        Q.    You never saw any effort by PDOX, Inc.

10   that they were trying to generate revenue off of the

11   AngioMouse trademark, did you?

12       A.    No.

13       Q.    Okay.   And the same, let's go to HDRA.

14   Did you ever see any indication that -- well, strike

15   that.

16             Could PDOX, Inc. use the HDRA process?

17       A.    Mr. Ellman and I discussed this

18   possibility of having another agreement where we

19   would incorporate HDRA into our collaboration.   We

20   discussed this possibility, because HDRA could have

21   been complimentary to PDOX.

22       Q.    But it never reached the stage of a

23   proposed written agreement, did it?

24       A.    No, sir.

25       Q.    Okay.

                                          Page 77

EXHIBIT 3
0017

```
1          A.    Mr. Kirby --

2          MR. VALENTI:  Calls for speculation.

3          THE WITNESS:  Thank you.  We had a

4   discussion yesterday, if AntiCancer were to be --

5   would put on its website "Kirby Law," and make the

6   implications of putting Kirby Law on AntiCancer's

7   website is that one could do business with Kirby Law

8   through AntiCancer.  This is not good for Kirby Law.

9          So putting our trademarks on their --

10  Certis' website is confusing in the market.  It's

11  wrong.  You wouldn't want Kirby Law on our website.

12  It's wrong.  So this is confusing in the --

13  confusing the market.

14  BY MR. KIRBY:

15         Q.    But when those two trademarks went on the

16  PDOX, Inc. website, they did so with your direct

17  approval, didn't they?

18         A.    Mr. Kirby, that's right.

19         Q.    Okay.  And --

20         A.    And if you had given me permission to put

21  Kirby Law on our website, you couldn't complain

22  about it.  But then after you and I had a fight and

23  we broke off our agreements and I kept Kirby Law on

24  our website, that's a violation, not good.

25         So it's one thing when we have an
```

                                                    Page 88

EXHIBIT 3
0018

1   was no agreement.  So this -- we were -- as I was

2   testifying about --

3        Q.   Was Exhibit 57.

4        A.   Yeah, is this 57?  Yes.  The PDOX mark is

5   not part of either agreement.

6        Q.   Okay.  But there is no writing, sir,

7   about -- that was issued on or before March 4, 2018,

8   terminating any licenses granted by AntiCancer to

9   PDOX or Certis.

10       A.   We never granted a license for PDOX.

11       Q.   Well, sir, when you write a letter that

12  says "on or before March 4, 2018, AntiCancer revoked

13  and terminated," how was that carried out?

14            MR. VALENTI:  Can you finish that

15  sentence, Mike?  Because I think that changes the

16  meaning.

17            MR. KIRBY:  It says, revoked and

18  terminated any and all alleged implied licenses by

19  AntiCancer to Certis Oncology Solutions, Inc. for

20  any and all of AntiCancer's intellectual property,

21  IP, including, but not limited to, patent, patent

22  applications, trademarks.

23  BY MR. KIRBY:

24       Q.   How was this -- what form did this

25  termination on or before March 4, 2018, take?

Page 94

EXHIBIT 3
0019

1    A.    This was the date of the theft, so it was

2    my understanding that that theft left them with no

3    rights.

4    Q.    Would you agree, Dr. Hoffman, that there's

5    never been a written -- had never been, as of

6    March 4, 2018, any written notification of

7    termination issued from PDOX, Inc. -- excuse me --

8    from AntiCancer, Inc. to PDOX or Certis, was there?

9    A.    One more time, please.

10   Q.    Sure.   This letter says that on or before

11   March 4, 2018, AntiCancer revoked and terminated,

12   and my question is, there was never such written

13   notice of termination or revocation, was there?

14   A.    No.

15   Q.    And you're saying that the moving out and

16   taking the equipment that PDOX, Inc. took was a

17   revocation?

18   A.    No, sir.

19   Q.    What happened on or before March 4, 2018,

20   that you're referring to in this letter?

21   A.    Our PDOX tumors were stolen.

22   Q.    But this letter relates to -- first of

23   all, it says AntiCancer's intellectual property

24   including but not limited to patents, patent

25   applications, trademarks, the licensing agreement

Page 95

EXHIBIT 3
0020

# EXHIBIT 4

**EXHIBIT 4**
0021



**ANTICANCER**
I N C O R P O R A T E D

7917 OSTROW STREET, SAN DIEGO, CALIFORNIA 92111-3604
TELEPHONE 858-654-2555
FACSIMILE 858-268-4175

E-MAIL: all@anticancer.com
www.anticancer.com

May 22, 2019

**VIA CERTIFIED MAIL**

Peter Ellman
Certis Oncology Solutions, Inc.
4940 Carroll Canyon Rd., Suite 120
San Diego, CA 92121

Dear Mr. Ellman,

This letter shall serve as official notice and reaffirmation that on or before March 4, 2018
AntiCancer, Inc.("AntiCancer") revoked and terminated any and all alleged implied license/s by
AntiCancer to Certis Oncology Solutions, Inc. ("Certis") for any and all of AntiCancer's
Intellectual Property ("IP," including but not limited to patents, patent applications, trademarks,
trade secrets, information, and know how).

Specifically, on or before March 4, 2018 AutiCancer revoked and terminated any such implied
license to its federal trademark "PDOX," and hereby restates such revocation and termination,
and demands Certis cease and desist any further infringing use of the mark and any other
AntiCancer IP, including but not limited to patents, patent applications, trademarks, trade secrets,
information, and know how.

Sincerely,

Robert M. Hoffman, PhD
President and CEO

Exhibit 58
Robert Hoffman
9/14/2019

Lauren Ranssoyer
CSR No. 14004

**EXHIBIT 4**
0022

CERTIFIED MAIL

7018 3090 0000 6662 1692

U.S. POSTAGE PAID
FCM LETTER
SAN DIEGO, CA
92111
MAY 22, 19
AMOUNT
**$6.30**
R2304E105535-20

Born Swallow

Peter Ellman
Certis Oncology Solutions, Inc
4940 Carroll Canyon Rd
Suite 120
San Diego CA

RETURN RECEIPT
REQUESTED

RETURN RECEIPT
REQUESTED

92121-173599

**EXHIBIT 4**
0023